[S.F. No. 22729. In Bank. Nov. 25, 1970.]

ROBERT V. HOGAN, Plaintiff and Respondent, v.
MIDLAND NATIONAL INSURANCE COMPANY,
Defendant and Appellant.

554

556

**COUNSEL**

Carroll, Davis, Burdick & McDonough and J. D. Burdick for Defendant and Appellant.

Mayall, Hurley, Knutsen & Smith, Mayall, Hurley, Knutsen, Smith & Green and Edwin Mayall for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Defendant Midland National Insurance Company issued a policy of insurance to Diehl Machines, Inc., a manufacturer of wood processing machinery, insuring it against liability for property damage caused by accident. William F. Kaufman and Evelyn Kaufman[1] purchased a saw manufactured by Diehl for use in their lumber business and they suffered substantial monetary loss because of defects in the saw. They brought an action against Diehl, and Midland refused to defend the suit on the ground that the policy did not cover the claims asserted by Kaufman. Diehl defended the action at its own expense and judgment was rendered against it for $30,195.61.

Thereafter, Diehl assigned its cause of action against Midland to Robert V. Hogan, plaintiff here. He sued Midland for the damages which Diehl was required to pay, as well as for attorneys' fees and costs expended by Diehl in the prior action. The trial court rendered judgment in plaintiff's favor for $57,064.91. On this appeal by Midland the primary questions are whether particular items of damage suffered by Kaufman and awarded in the judgment against Diehl are within the coverage of the policy issued by Midland and whether it is liable for some or all of Diehl's attorneys' fees and costs of defense.

In the judgment against Diehl damages were awarded as follows: (1) $8,038.49 for lumber which the saw cut too narrow; (2) $7,850 for the cost of lumber deliberately cut wider than necessary in order to prevent rejection for undercutting and additional freight charges incident to such overcutting; (3) $6,793.88 for the cost of paying wages and other expenses for periods during which the saw failed to operate altogether; (4) $5,449.49 for the cost of leasing and cancelling the lease on a machine known as a finger jointer-scarfer, which was to be used in conjunction with the saw.[2]

### I

Midland contends that none of the foregoing items of damage was recoverable because they were not caused by an accident within the meaning of the policy. It asserts also that the last three items listed above are not within the policy coverage because they did not involve damage to tangible

---

[1]For literary convenience the plaintiffs in the prior action will be denominated Kaufman, Midland National Insurance Company will be referred to simply as Midland, and Diehl Machines, Inc., will be called Diehl.

[2]The trial court also awarded Kaufman the cost of the saw and freight charges for shipping but this item of damage is not involved in the instant case.

property, and, further, that these damages are excluded from coverage because they are attributable to the loss of use of the saw, an element specifically excluded by the policy. Finally, Midland insists it had no duty to defend the Kaufman action and that, therefore, it should not be liable for Diehl's costs and attorneys' fees.

We reach the following conclusions: The damage to the boards which were undercut resulted from an accident within the meaning of the policy, but the lumber deliberately cut too wide was not damaged as the result of an accident. The overhead costs for the period during which the saw was not operating are not recoverable because of the specific policy exclusion of coverage for loss of use. The cost of renting the jointer-scarfer does not represent damage to tangible property and is not within the policy's coverage. Finally, Midland was under a duty to defend Diehl in the Kaufman action and is liable for all costs and attorneys' fees expended by Diehl for this purpose.

The policy provides that Midland must pay all sums which Diehl "shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, *caused by accident* and arising out of the hazards hereinafter defined." (Italics added.) An endorsement entitled "Inefficacy Clause" excludes liability for "repairing or replacing any defective products . . . manufactured . . . by the Assured or any defective part . . . thereof," and for the "loss of use of any such defective product . . . or part . . . thereof." The policy contains a clause requiring Midland to defend suits brought against Diehl seeking damages within the policy's coverage.

Kaufman purchased the saw to utilize in his cut stock operations in June 1961 and began to use it in September of that year.[3] There were defects in the product from the outset. Various parts of the machine did not function properly and over a period of many months Kaufman attempted, with the assistance of Diehl and the salesman who arranged the purchase of the saw, to make repairs. Some of the defects were in fact remedied while others could not be corrected. From the beginning there were problems with the size of the lumber that came through the saw, the widths cut being too narrow. However, these deficiencies were not sufficiently serious to cause customers to reject the lumber until the spring of 1962. On April 24 of that

---

[3]Some of the facts recited are taken from the reporter's transcript in the Kaufman-Diehl action. The parties stipulated that the trial court in the present action could refer to the transcript in the prior trial. However, such stipulation was entered into after plaintiff objected to the introduction of the transcript on the ground that the evidence introduced in the prior action was immaterial because an insurer which refuses to defend an action may not later assert noncoverage of the policy. This contention will be discussed *infra*.

year a customer complained that an order shipped to him the previous month contained lumber which was too narrow. After April 24 other purchasers rejected shipments for the same reason. The lumber rejected for undercutting had been processed prior to April 24. After that date, in order to avoid complaints in the future, Kaufman deliberately cut lumber wider than specified in orders. No rejections resulted from such overcutting.

During the period from September 5, 1961, to April 30, 1962, for a total of 61 working days the Diehl saw failed to function by reason of defects. The cost of operating the business continued throughout this period since Kaufman was required to pay salaries to employees during the intermittent periods of idleness.

Kaufman rented a finger jointer-scarfer for further processing the lumber sawed by Diehl's machine. He was unable to use the finger-jointer because the Diehl saw did not operate properly.

## II

In *Geddes & Smith, Inc.* v. *St. Paul Mercury Indemnity Co.* (1959) 51 Cal.2d 558, 563-564 [334 P.2d 881], hereinafter called *Geddes* I, a policy insured against liability for injury to property caused by accident. The insured manufactured aluminum doors which were installed in homes built by a contractor. The doors proved to be defective after installation. We stated, "No all-inclusive definition of the word 'accident' can be given . . . 'as a source and cause of damage to property, within the terms of an accident policy, [accident] is an unexpected, unforeseen, or undesigned happening or consequence from either a known or unknown cause.' The door failures were unexpected, undesigned and unforeseen. They were not the result of normal deterioration . . . they occurred suddenly . . . each door, when it failed, failed suddenly."

Midland insists that the damage to the boards resulting from cutting the widths too narrow was not the result of an accident within this definition of the term. It is asserted that all of the damages assessed against Diehl were not only foreseeable and expectable but were in fact foreseen since Kaufman knew from the outset that the saw was defective and would not cut lumber to the precise size desired. There was testimony by Kaufman conceding that he had difficulty with the widths cut by the saw from the beginning of its operation.

However, the evidence establishes that with Diehl's help Kaufman attempted to remedy the defects in the saw, that it was working satisfactorily insofar as the widths were concerned some of the time, and that not until April 1962, more than seven months after the initial use, did Kaufman be-

come aware the lumber cut by the saw was sufficiently defective to cause a customer to reject an order. Immediately thereafter, he commenced to cut all lumber overwide to avoid customer complaint. It thus appears that the narrow boards had been processed by the time Kaufman was aware that the defects in the saw were sufficiently serious to affect his clientele. Under the circumstances, there is no merit in Midland's assertion that damages resulting from undercutting were foreseeable and expectable under the *Geddes* I rule.[4]

■ The circumstances, and the legal consequences, differ as to the boards cut too wide. By design Kaufman processed the boards wider than required for his orders in order to avoid rejection for undercutting. The damages awarded by the trial court were for the additional cost of the lumber necessary for the larger widths and the added freight cost. Whatever the motivation, there is no question that these boards were *deliberately* cut wider than necessary; the conduct being calculated and deliberate, no *accident* occurred within the *Geddes* I definition.

Plaintiff claims that in the Kaufman action the trial court by inference found that the damages due to overcutting were caused by accident because it found that Kaufman had not assumed the risk of using the saw with knowledge of its defects. It was established in the prior action that, due to Diehl's improper conduct in delivering a defective saw, Kaufman deliberately cut boards too wide in order to avoid damages from undercutting. ■ One does not assume a risk of harm unless he voluntarily accepts the risk and acceptance is not voluntary if the defendant's tortious conduct reasonably requires him to undertake the risk in order to avert harm to himself. (Rest.2d Torts, § 496E.) ■ The deliberate nature of Kaufman's act (i.e., he contemplated the result of his act before he cut the boards) prevented the overcutting from constituting an accident, yet the trial court could find Kaufman did not assume the risk of overcutting because his conduct was reasonably induced by Diehl's negligence. Thus, there is no antagonism between our conclusion that the overcutting was not caused by an

---

[4] Midland also relies upon findings of the trial court in the prior action that Diehl attempted to remedy the defects in the saw between September 1961 and April 1962, that Kaufman's conduct subsequent to the time he obtained knowledge of the defects was reasonable, and that he did everything in his power to mitigate damages. It is argued that these findings show that the trial court found that Kaufman's damages were foreseeable but that he attempted to mitigate damages. The findings do not indicate that the damages resulting from undercutting were in fact foreseeable but only that Kaufman acted reasonably after discovering defects in the saw. Moreover, the findings obviously do not relate to the problem of undercutting insofar as mitigation of damages is concerned. Kaufman did not deliberately cut boards too narrow for acceptance by his customers in order to mitigate damages resulting from defects in the saw.

accident and the trial court's finding that Kaufman did not assume the risk of using a defective saw.

Plaintiff next contends that the manufacture and marketing of defective products resulting in property damage constitutes an accident even in the absence of an unexpected or unforeseen occurrence. To so hold would require recasting our *Geddes* I definition of the term accident. None of the cases cited in support of plaintiff's novel proposition (e.g., *Bundy Tubing Company* v. *Royal Indemnity Company* (6th Cir. 1962) 298 F.2d 151; *Ritchie* v. *Anchor Casualty Co.* (1955) 135 Cal.App.2d 245 [286 P.2d 1000]; *Hauenstein* v. *St. Paul-Mercury Indem. Co.* (1954) 242 Minn. 354 [65 N.W.2d 122]) involved a situation in which the plaintiff there knew, prior to using the product, that it was defective and would cause damage.

Plaintiff also contends that Diehl's reasonable expectations were that the policy would cover claims for damages for negligence, breach of warranty or strict liability in tort (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 271 [54 Cal.Rptr. 104, 419 P.2d 168]) and that if Midland's views as to what constitutes an accident were accepted, Diehl would have obtained nothing of value for its premium dollar. There was no evidence in the record as to the expectations of the parties and no indication that Diehl anticipated coverage for liability not attributable to accident. The basic coverage for property damage liability due to accident is common in products liability policies and the scope of such coverage has been litigated with some frequency. (See, e.g., *Geddes* I; *Hauenstein* v. *St. Paul-Mercury Indem. Co.*, *supra*, 242 Minn. 354.) ■ One who purchases an insurance policy against liability for property damage due to accident cannot reasonably expect to obtain coverage for consequences clearly outside the scope of the definition of accident. ■ Under the policy, Diehl was covered for accidental damage to property, such as occurred in the undercutting of the boards, as well as the right to have Midland defend actions brought against Diehl within the actual or potential coverage of the policy.

We come, then, to the problem of the overhead costs during the period the saw failed to operate between September 1961 and April 1962 and whether they are covered by the policy. ■ As we have seen, the policy contains an "Inefficacy Clause" which sets forth a specific exclusion for "claims made against the Assured . . . For the loss of use of any . . . defective product" sold by Diehl. Under this exclusion damages, such as overhead costs, incurred during the period the saw failed to operate are not recoverable.

The final item of damages recovered by Kaufman was the cost of leasing and cancelling the lease on the jointer-scarfer. As we have seen, this machine

was rented for the purpose of being used in conjunction with the saw, but Kaufman could not use it since the saw did not operate properly.

In *Geddes* I, this court refused to award the plaintiff damages to his business and goodwill as a result of the defects in the doors covered by the products liability policy. We stated that the word "property" as used in the policy provision insuring against liability "because of injury to or destruction of property" refers to physical or tangible property. "Thus it is such property, not goodwill or [*sic*] a business entity, that is ordinarily thought of as the subject of use, and it is to damage to such property that all of the exclusions are directed. Any breach of contract may harm the business of the injured party, and if sufficiently serious, may affect his goodwill. Such damages, however, are not commonly thought of as injuries to or destruction of property within the meaning of a public liability insurance policy."[5] (51 Cal.2d at p. 566.)

We clarified these statements in *Geddes & Smith, Inc.* v. *St. Paul Mercury Indem. Co.* (1965) 63 Cal.2d 602 [47 Cal.Rptr. 564, 407 P.2d 868], hereinafter referred to as *Geddes* II. The question involved in *Geddes* II was whether overhead expenses incurred during the time the defective doors were being replaced were recoverable. We explained that, although *Geddes* I made it plain that only damages to physical or tangible property were included in the policy, the overhead costs during the time repairs were being made were within the coverage of the policy because they provided a measure of the dollar amount of injury to the tangible property involved there, i.e., the houses in which the doors had been installed.

Plaintiff maintains that the cost of renting the jointer-scarfer is similar to the overhead expenses involved in *Geddes* II, and, although such cost does not represent injury to tangible property, it is nevertheless recoverable under the holding of that case.[6]  ■  *Geddes* II makes it clear that loss from damage to intangibles is recoverable only to the extent that it provides a measure of damages to physical property which is within the policy's cover-

---

[5]*Geddes* I goes on to state, "Defendant did not undertake to insure against all breaches of contract caused by accident. It required an injury to or destruction of property and excluded injury to or destruction of goods or products sold by the insured. The significance of this exclusion would be obvious had the defects appeared before any of the doors had been installed. In such event it could not be seriously contended that an injury to property other than the doors had occurred within the meaning of the policy even though plaintiff's inability to use them seriously interfered with its business and injured its goodwill. Such damages are no less outside the coverage of the policy because there was also damage to the houses." (51 Cal.2d at p. 566.)

[6]It is also claimed that the overhead costs during the time the saw was not operating and the damages suffered as a result of cutting overwidth lumber are recoverable under these principles. However, as we have seen, these items are not included within the coverage of the policy for reasons discussed above.

age. Here, the inability of Kaufman to use the rented machine was not the result of injury to physical property within the coverage of the policy. (*St. Paul Fire & Marine Insurance Co.* v. *Northern Grain Co.* (8th Cir. 1966) 365 F.2d 361, which purported to distinguish *Geddes* I insofar as it defined "property" as referring to tangible items, is not persuasive authority in view of our reaffirmance of the *Geddes* I holding in *Geddes* II.

### III

The next problem is whether Midland is liable for attorneys' fees and costs expended by Diehl in defending the action brought by Kaufman and, if so, to what extent. Midland concedes that it had the duty to defend the Kaufman action if the facts at the trial established coverage. ■ Since we have concluded that the policy covered the damages suffered by Kaufman as a result of undercutting, Midland was required to defend the action.

Midland urges, however, that even if it was required to provide a defense as to some elements of damage asserted by Kaufman, its duty was limited to those items of damage as to which there was coverage under the policy. Therefore, it asserts, its liability for attorneys' fees expended by Diehl should be prorated in the ratio that the amount of damages found to be covered by the policy bears to the total damages.

■ The rule is settled that an insurer is under a duty to defend a claim whenever the allegations of a complaint would support a recovery upon a risk covered by the policy. (See, e.g., *Blackfield* v. *Underwriters at Lloyd's, London* (1966) 245 Cal.App.2d 271, 274 [53 Cal.Rptr. 838]; *Eichler Homes, Inc.* v. *Underwriters at Lloyd's, London* (1965) 238 Cal.App.2d 532, 538 [47 Cal.Rptr. 843].) In these cases, however, various theories of recovery were asserted by the plaintiff, only one or more of which were within the coverage of the policy. The circumstances of the present case differ somewhat in that the complaint alleges facts bringing the action within the policy's coverage[7] but the proof at the trial indicates that the insurer was not liable for some of the damages suffered by the plaintiff.

---

[7]Kaufman alleged that he attempted to operate the saw, that it would not function properly, and that it was negligently manufactured. He averred that the saw would not cut to precise tolerances and would not cut straight lines or make parallel cuts and that it damaged the wood which it processed. It was further alleged that the damages were continuing in nature. These allegations at least potentially assert injury to property as the result of an accident. Midland, in arguing to the contrary, asserts that these allegations establish that Kaufman knew from the outset that the saw would damage the lumber cut with it. But the mere fact that the complaint states that Kaufman attempted to operate the machine and that it would not work properly does not support such an assertion. Nor would the continuing nature of the damages negate the possibility that some of the damages from the use of the saw resulted from acci-

The cases which have considered apportionment of attorneys' fees upon the wrongful refusal of an insurer to defend an action against its insured generally have held that the insurer is liable for the total amount of the fees despite the fact that some of the damages recovered in the action against the insured were outside the coverage of the policy. (*Mannheimer Bros.* v. *Kansas Casualty & Surety Co.* (1921) 149 Minn. 482 [184 N.W. 189, 190]; *Prince* v. *Universal Underwriters Insurance Co.* (N.D. 1966) 143 N.W.2d 708, 717; *Globe Navigation Co.* v. *Maryland Casualty Co.* (1905) 39 Wash. 299 [81 P. 826, 828].)

In its pragmatic aspect, any precise allocation of expenses in this context would be extremely difficult and, if ever feasible, could be made only if the insurer produces undeniable evidence of the allocability of specific expenses; the insurer having breached its contract to defend should be charged with a heavy burden of proof of even partial freedom from liability for harm to the insured which ostensibly flowed from the breach. (See Annot. in 41 A.L.R.2d 434, 438.) Diehl sought to absolve itself of any liability for Kaufman's damages, regardless of whether or not such damages were covered by the policy. Midland does not suggest how a determinable portion of the attorneys' fees expended by Diehl in this effort could be allocated to the damages suffered by Kaufman as a result of accident.

## IV

■ The final matter requiring consideration is a contention of plaintiff that as the consequence of Midland's wrongful refusal to defend Diehl it is liable for the entire judgment against Diehl and may not now deny coverage as to certain items of damage. As we have seen, plaintiff objected to the introduction of the transcript in the Kaufman action on the ground that Midland is bound by the judgment in that case and cannot in a subsequent action assert the defense of noncoverage.

We rejected such reasoning in *Geddes* I, stating, "An insurer that has been notified of an action and refuses to defend on the ground that the alleged claim is not within the policy coverage is bound by a judgment in the action, in the absence of fraud or collusion, as to all material findings of fact essential to the judgment of liability of the insured. The insurer is not bound, however, as to issues not necessarily adjudicated in the prior action and can still present any defenses not inconsistent with the judgment against the insured. . . . The issues that defendant litigated in the trial court and

---

dent. For all that appears on the face of the complaint, the bulk of Kaufman's damages might have been caused by his use of the saw prior to any knowledge on his part that it was defective, and such damage would plainly be due to accident. While the complaint did not state that the saw was used without knowledge that it would damage the lumber, it does not eliminate that possibility as to at least some of the damages.

that are raised in this appeal concern the scope of policy coverage and were not adjudicated in the prior action." (51 Cal.2d at pp. 561-562.)[8]

In both *Geddes* I and *Geddes* II we reduced the amount of the judgment recovered by the insured against the insurer on the ground that some of the damages awarded in the underlying action against the insured were not within the coverage of the policy. In the present case it is clear that whether Kaufman's damages were caused by accident and whether the policy exclusions were applicable to his claim were not litigated in the prior action.

Statements in some cases to the effect that the judgment in the underlying action is conclusive as to the insurer's liability (e.g., *Bonfils* v. *Pacific Auto. Ins. Co.* (1958) 165 Cal.App.2d 152, 162-163 [331 P.2d 766]; *Ford* v. *Providence Washington Ins. Co.* (1957) 151 Cal.App.2d 431, 436 [311 P.2d 930]; *Lamb* v. *Belt Casualty Co.* (1935) 3 Cal.App.2d 624, 628, 631 [40 P.2d 311]) hold only that if factual matters upon which the issue of coverage turns are expressly or impliedly determined in the prior action such determinations bind the insurer in the subsequent suit to enforce the provisions of the policy.

Other authorities relied upon by plaintiff are also inapposite. *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654 [328 P.2d 198, 68 A.L.R.2d 883], held the insurer liable for amounts over the policy limit because of its wrongful refusal to settle the underlying action. The opinion distinguishes the consequences of a wrongful refusal to settle and a wrongful refusal to defend, pointing out that as to the latter, the liability of the insurer is ordinarily limited to the amount of the policy plus attorneys' fees and costs. (50 Cal.2d at p. 659.) *Tomerlin* v. *Canadian Indemnity Co.* (1964) 61 Cal.2d 638 [39 Cal.Rptr. 731, 394 P.2d 571], involved a misrepresentation to the insured by the insurer's agent that the insurer would be liable under the policy. Relying upon this representation, the insured withdrew his own attorney as a participant in the case and after judgment was rendered against him the insurer disclaimed liability. We held that the insurer was estopped to deny liability and that it would be held liable for the amount of the judgment since it would be impossible for the insured to prove the precise extent of the loss caused by the withdrawal of his attorney.

*Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d 263, is also distinguishable. We there held that an insurer which wrongfully refused to defend an action against the insured should be held liable for the amount of the judg-

---

[8]In Illinois the rule is that an insurer is estopped from asserting noncoverage if he has failed to provide a defense and the claim is within the coverage of the policy. (*McFadyen* v. *North River Insurance Company* (1965) 62 Ill.App.2d 164 [209 N.E.2d 833, 836-837]; *Sims* v. *Illinois National Casualty Co.* (1963) 43 Ill.App.2d 184 [193 N.E.2d 123, 129].)

ment against its insured. It was not clear from the verdict in the prior action whether it was rendered on a theory within or without the policy's coverage. In answer to the insurer's contention that it should not be liable for the amount of the judgment because it was not necessarily rendered on a theory within the policy's coverage, we relied on the holding in *Tomerlin* that to require the insured to show the extent of the loss caused by the insurer's breach would cast an impossible burden upon him. *Gray* therefore stands for the proposition that the insurer is liable whenever the trial in the underlying action involved a theory of recovery within the coverage of the policy and it was not clear whether the jury's verdict was based upon that theory. The present case is distinguishable because the issues upon which coverage depended were not raised in the Kaufman action. Here it cannot be said that the court in the Kaufman action could have impliedly determined the issues relating to coverage.

The judgment of the trial court is affirmed insofar as it awards plaintiff damages for the lumber cut to a width too narrow plus Diehl's attorneys' fees and costs, but it is reversed insofar as the other damages recovered by Kaufman are concerned. The matter is returned to the trial court for appropriate calculation and judgment in accordance with the views expressed herein. The plaintiff is to recover costs on appeal.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

Respondent's petition for a rehearing was denied December 23, 1970.