[Civ. No. 54522. First Dist., Div. One. June 25, 1984.]

ECONOMY LUMBER COMPANY OF OAKLAND, INC.,
Plaintiff and Appellant, v.
INSURANCE COMPANY OF NORTH AMERICA,
Defendant and Respondent.

**[Opinion certified for partial publication.†]**

---

†The section entitled *Breach of an Implied Covenant* is not certified for publication as it does not meet the standards for publication contained in rule 976(b), California Rules of Court.

642

**COUNSEL**

David Jay Morgan for Plaintiff and Appellant.

Paul A. Conroy and Williams, Van Hoesen & O'Connor for Defendant and Respondent.

---

OPINION

**HOLMDAHL, J.**—This is an appeal from a judgment holding that a general liability insurance policy issued to appellant does not cover its claim for property damage.

The judgment is reversed and remanded.

*Statement of Facts*

In December, 1976, plaintiff and appellant Economy Lumber Company of Oakland, Inc. (hereafter, Economy Lumber), contracted to sell 90,000 board feet of specially milled siding to Arlotta and Paradise Construction Company (hereafter, A&P). A&P was the general contractor on a construction project in Foster City and intended to use the siding on the exterior of homes it was building there. Economy Lumber contracted with D. L. Ford & Company (hereafter, Ford) to perform the milling and then to deliver the lumber to the construction site.

A&P received the siding from Ford and began to apply it to eight houses. Within a day or two, after about 25 percent of the total amount of the siding had been applied, it became apparent that the siding had been mismilled. The pieces were not of uniform size and caused the exterior of the homes to take on a very unsightly appearance, quite obvious to any onlooker. Apparently, the defect could not have been detected prior to the application of the siding. A&P soon thereafter notified Economy Lumber of the problem.

Economy Lumber estimated that it would incur a loss of $80,000 should A&P refuse to keep the lumber. The siding, of a kind rarely used in California, in addition to being defective, was worthless for resale purposes. Economy Lumber negotiated with A&P in order to mitigate the damages and they entered into an agreement on September 13, 1977. A&P agreed to use the defectively milled siding to finish the eight houses, because that was the cheapest solution. The remaining lumber was remilled at Economy Lumber's expense and was used by A&P as siding on another project. Economy Lumber paid to A&P a total of $16,318.30. In return, A&P released Economy Lumber from further liability.

During this period, Economy Lumber had been insured under a general comprehensive liability policy by Insurance Company of North America (hereafter, INA). Appellant notified INA that the siding was defective, and INA established a file for the claim.

On September 22, 1977, Economy Lumber filed suit for breach of warranty against Ford, which also happened to be insured by INA. INA initially defended Ford, but withdrew the defense upon its determination that Ford's policy afforded no coverage on the matter litigated. Economy Lumber eventually obtained a $20,000 default judgment against Ford, which had not been paid at the time of trial. On March 7, 1978, INA rejected Economy Lumber's claim for reimbursement of the $16,318.30 it had paid to A&P, on the ground that its policy did not cover the claimed damage.

### Procedural History

On September 8, 1978, Economy Lumber filed a complaint for declaratory relief in San Francisco Superior Court against INA, claiming that its policy did provide coverage. After trial without a jury, the trial judge issued findings and conclusions, and judgment was entered in favor of INA.

Economy Lumber filed a timely appeal.

### Policy Provisions

The case before us concerns the construction of an insurance policy. Its terms are ambiguous as applied to the facts of this case, rendering their interpretation difficult, indeed. ■ In noting that INA wrote the policy, we are reminded and guided by the general rule that "[t]he test we must apply in construing the policy [is to] be summarized as follows: this court must resolve uncertainties in favor of the insured and interpret the policy provisions according to the layman's reasonable expectations. [Citations.]" (*Russell* v. *Bankers Life Co.* (1975) 46 Cal.App.3d 405, 413 [120 Cal.Rptr. 627].)

■ We further note that the question presented, "[t]he construction of the instant policy[,] is one of law because it is based upon the terms of the insurance contract. Accordingly, we are not bound by the trial court's interpretation of the policy, and it is our duty to make the final determination in accordance with the applicable principles of law. (*Parsons* v. *Bristol Development Co.*, 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *Estate of Platt*, 21 Cal.2d 343, 352 [131 P.2d 825].)" (*Russell* v. *Bankers Life Co.*, *supra*, 46 Cal.App.3d 405, 413.)

Economy Lumber was insured by INA under a comprehensive general liability insurance policy. The policy provides, in part:

"The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of

"A. bodily injury

"B. property damage

"to which this insurance applies, caused by an occurrence . . . ." The term "occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the Insured."

The term "property damage" is defined as: "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."

According to respondent, appellant's insurance policy does not apply:

"(m) To loss of use of tangible property which has not been physically injured resulting from . . . (2) the failure of the Named Insured's products to meet the level of performance, quality, fitness or durability warranted or represented by the Named Insured;

"(n) To property damage to the Named Insured's products arising out of such products or any part of such products;

"(p) To damages claimed for the withdrawal, repair, replacement or loss of the use of the Named Insured's products . . . or of any property of which such products are withdrawn from use because of any known or suspected defect or deficiency therein; and

"(y) To property damage . . . (2) except with respect to liability under a written sidetrack agreement or the use of elevators to . . . (d) that particular part of any property, not on the premises owned by or rented to the Insured, . . . (iii) the restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the Insured."

## The "Occurrence" as an "Accident"

The initial question is whether the application of the defective siding was an "occurrence" accidentally causing property damage to the houses. The trial court determined that there had been no occurrence, because A&P and Economy Lumber continued to use the siding even after the discovery of its defective condition.

(3) The policy defines an "occurrence" as an "accident." The cases on point have interpreted an "accident" to be "an unexpected happening . . . , an unforeseen unplanned event . . . ." (*Cowman* v. *Department of Motor Vehicles* (1978) 86 Cal.App.3d 851, 853 [150 Cal.Rptr. 559].) "It ' "includes *any event which takes place without the foresight or expectation of the person acted upon or affected by the event."* ' [Citations.] 'Accident, as a source and cause of damage to property, within the terms of an accident policy, is an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown cause.' [Citation.]" (*Geddes & Smith Inc.* v. *St. Paul Mercury Indemnity Co.* (1959) 51 Cal.2d 558, 563-564 [334 P.2d 881] (*Geddes I*); italics in original.)

In *Hauenstein* v. *Saint Paul-Mercury Indem. Co.* (1954) 242 Minn. 354 [65 N.W.2d 122, 124], plaintiffs, who distributed plaster, were insured against "loss by reason of the liability imposed by law or contract upon the Insured for damages because of injury to or destruction of property, including the loss of use thereof, caused by accident." Plaintiffs sold plaster to a contractor who used it on a construction job. After its application, the plaster shrank, cracked, and had to be removed and replaced.

On appeal the court stated: "There is no doubt that the property damage to the building caused by the application of the defective plaster was 'caused by accident' within the meaning of the insurance contract, since the damage was a completely unexpected and unintended result." (*Id.,* at p. 126.)

In *Hogan* v. *Midland National Ins. Co.* (1970) 3 Cal.3d 553 [91 Cal.Rptr. 153, 476 P.2d 825], the insured had sold a defective saw to a lumber business. The saw cut the lumber more narrowly than it should have. This fact, however, was not discovered until after a substantial amount of the lumber had been processed. Thereafter, the lumber was cut overwide to compensate for the defect in the saw.

The court, relying on *Geddes I, supra,* 51 Cal.2d 558, found that there had been an accident, inasmuch as the undercutting had been unforeseeable. Once the lumber company discovered the defect and deliberately began to

cut the lumber more widely, however, it could no longer be said that an accident had occurred. "The deliberate nature of Kaufman's act (i.e., he contemplated the result of his act before he cut the boards) prevented the overcutting from constituting an accident." (*Hogan* v. *Midland National Ins. Co., supra,* 3 Cal.3d 553, 560.) Recovery was allowed only for losses incurred before discovery of the defect.

█ In the present case, recovery for damage occurring after the discovery of the defects is precluded, because after that point it cannot be said that the damage caused by the siding was unforeseeable. That is, there was no occurrence with respect to the houses on which siding had not yet been applied. Until these defects were discovered, however, the damage was clearly unexpected under the reasoning of *Hauenstein* and *Hogan.* Therefore, there was an "occurrence" affecting the eight houses to which the siding was first applied.

INA contends that because A&P and Economy Lumber elected to continue to use the siding on the eight houses, fully aware of its flaws, the damage to those houses was also no longer unforeseen or accidental. Therefore, no recovery is possible. We conclude otherwise: each house is an indivisible entity; damage to each occurred, whether the houses were finished with proper siding or with defective siding. It was the initial application of the defective siding which caused unforeseen damage. It would be unrealistic and artificial to hold that completion of the partially sided houses with defective siding renders foreseeable the damage which resulted from the initial application of the siding.

Furthermore, a denial of coverage on the basis that additional defective siding was knowingly used to finish the houses, in essence, penalizes Economy Lumber for mitigating its losses, since the alternative option of replacing the flawed siding would have been most costly. The policy of the courts is to encourage mitigation of damages. See generally *Geddes & Smith Inc.* v. *St. Paul Mercury Indem. Co.* (1965) 63 Cal.2d 602, 605 [47 Cal.Rptr. 564, 407 P.2d 868] (*Geddes II*).

We, therefore, conclude that there was an "occurrence" as concerns the damage to the eight houses to which defective siding was initially applied. As to the remaining houses in the project, no one contends that there was an "occurrence" and, in any event, we conclude that there was none.

### Policy Exclusions

Next, we must determine whether the policy's exclusions prevent recovery for property damage. The trial court ruled that Economy Lumber could

recover neither for damage to the siding, by virtue of exclusion (n), nor for damage to the eight houses caused by the siding, under exclusion (y).

We agree with the trial court that exclusion (n) applies to the siding itself, but conclude that recovery for damage to the eight houses is not precluded by exclusion (y).[1]

 The courts, in interpreting liability insurance policies, have consistently differentiated between damage to the product of the insured, and damage to other property caused by that product. (*Fresno Economy Import Used Cars, Inc.* v. *United States Fid. & Guar. Co.* (1977) 76 Cal.App.3d 272, 282 [142 Cal.Rptr. 681]; *Southern Cal. Edison Co.* v. *Harbor Ins. Co.* (1978) 83 Cal.App.3d 747, 756 [148 Cal.Rptr. 106]. See also Macaulay, *Justice Traynor and the Law of Contracts* (1961) 13 Stan.L.Rev. 812, 825.)

This differentiation is important to a determination of whether the insurance policy is intended to indemnify the insured for the particular damage in question. (See, e.g., *Rafeiro* v. *American Employers' Ins. Co.* (1970) 5 Cal.App.3d 799, 809 [85 Cal.Rptr. 701].) Accordingly, our analysis focuses upon (1) whether the damage in question is damage to the insured's product or to other property; and, (2) whether the given insurance policy provides indemnification for the loss.

In *Hauenstein* v. *Saint Paul-Mercury Indem. Co.*, *supra*, 242 Minn. 354 [65 N.W.2d 122, 125], the court allowed recovery for damage caused by the application of defective plaster. The damage was the loss in value of the building and the loss was found to be to other "property." The insured was a supplier, and it was held that he assumed liability only for damage to the defective product itself, the plaster, but not for the damage to the building.

Similarly, in *Geddes I* and *II* the California Supreme Court allowed a contractor to recover from the insurer of his supplier the amount of a judgment he had obtained against the supplier of defective doors. The doors began to show severe defects after they had been installed: Some fell out; some could not be closed; and, some locked in place. The court in *Geddes I*, reasoning that these defects had caused property damage other than to the doors themselves, wrote: "In the present case . . . it was necessary to remove the defective doors before they could be replaced, and we see no reason for not following the *Hauenstein* case and permitting recovery for damages to the houses according to the rule stated therein." (*Geddes I*,

---

[1]The other exclusions, (m), (n), and (p), are inapplicable as concerns damage to the houses.

*supra,* 51 Cal.2d 558, 565.) The insured, the supplier, was held liable only for the damage to his own product, the doors.

*Hauenstein* and the *Geddes* are to be distinguished from cases which concern liability policies issued to general contractors. Recovery in those cases has been permitted upon a showing of extensive damage to other property (e.g., damage to a house built by the contractor) indirectly caused by the faulty materials or workmanship. In keeping with the policy of narrow interpretation of exclusions against the insurer, the entire house was not construed to be the "product" of the contractor. (See *Blackfield* v. *Underwriters at Lloyd's, London* (1966) 245 Cal.App.2d 271 [53 Cal.Rptr. 838] (structural damage to houses); *Owens Pacific Marine Inc.* v. *Insurance Co. of North America* (1970) 12 Cal.App.3d 661, 666-668 [90 Cal.Rptr. 826] (boat destroyed when a hot water heater exploded). See also *Volf* v. *Ocean Accident & Guar. Corp.* (1958) *infra,* 50 Cal.2d 373 [325 P.2d 987]; *Liberty Bldg. Co.* v. *Royal Indemn. Co.* (1960) 177 Cal.App.2d 583, 587-588 [2 Cal.Rptr. 329]; *St. Paul Fire & Marine Ins. Co.* v. *Coss* (1978) 80 Cal.App.3d 888, 892-893 [145 Cal.Rptr. 836].)

However, damage inherent in defective workmanship and materials has been considered to be direct damage for which no coverage was intended, because, as the court in *Rafeiro* v. *American Employers' Ins. Co., supra,* 5 Cal.App.3d 799, 808 stated, "the insurance furnished, unlike malpractice insurance, was not intended to indemnify the contractor (and through him the owner) for direct damages resulting because the contractor furnished defective materials or workmanship. [Citation.]"

We conclude that *Hauenstein* and *Geddes I* and *II* are applicable to the situation before us. In the present case, as in those cases, it was claimed that there was property damage other than to the siding itself, the insured's product, in that the eight houses diminished in value. Second, as in those cases, the insured was a supplier, not a contractor. ■■ ■■■■ The damage to the eight houses was not a direct result of Economy Lumber's faulty workmanship or defective materials.[2]

---

[2]The trial court was requested to make a finding on the issue of whether A&P was the agent of Economy Lumber. It did not do so. The question of whether an agency relationship exists is one of fact, unless the evidence allows only a single inference. (*Dorsic* v. *Kurtin* (1971) 19 Cal.App.3d 226, 236 [96 Cal.Rptr. 528].) Here, the record indicates that A&P was the customer of Economy Lumber, as the trial court did determine, and that it was a separate entity acting entirely independently. The evidence does not permit an inference that Economy Lumber controlled the actions of A&P and we, therefore, conclude that A&P was not its agent. Accordingly, Economy Lumber cannot be held liable for the faulty workmanship by A&P, if any.

We are urged by INA to follow *St. Paul Fire & Marine Ins. Co.* v. *Coss, supra,* 80 Cal.App.3d 888, which contains an exclusion identical to exclusion (y). That case, however, follows the line of cases discussing contractors' liability policies. The insured was a general contractor and the claim was for damage to a home directly resulting from his faulty workmanship. There was no showing of unrelated property damage. As in *Rafeiro* v. *American Employers' Ins. Co., supra,* 5 Cal.App.3d 799, 808-809, the policy was not intended to indemnify the contractor for his faulty workmanship or materials. *St. Paul* is thus inappropriate to our factual situation.

Similarly, *Volf* v. *Ocean Accident & Guar. Corp., supra,* 50 Cal.2d 373 is inapplicable to our facts. There, as in *Coss,* only the defective product, the stucco wall, and no other entity had been damaged, and the insured was a contractor.[3]

Next, we consider the specific wording of exclusion (y). If we interpret "that particular part of any property" under (y)(2)(d) to refer to the siding, coverage for the siding is excluded by subparagraph (ii), "out of which any property damage arises," and subparagraph (iii), because its "restoration, repair and replacement" has been made necessary by faulty milling on behalf of Economy Lumber. However, the property damage to the houses itself remains covered.

If we were to interpret "that particular part of any property" to refer to the houses themselves, coverage for property damage to them would still result. As the supplier, Economy Lumber did not perform any faulty workmanship on the houses. The only reasonable interpretation of the exclusion would be to hold it applicable if Economy Lumber had itself performed work on the houses, or if such work was done on its behalf. Such was not the case.

We conclude, therefore, that while there is no coverage for the defective siding as such, the exclusion does not apply to loss of value to the eight houses for which there is policy coverage.

### The Settlement Agreement

The policy provides that INA "will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages"

---

[3]The result would have been different had the contractor, in removing the defective stucco, unavoidably damaged the house. The injury to the house would be covered. See *Justice Traynor and the Law of Contracts, supra,* 13 Stan.L.Rev. at page 825.

for injury covered by the policy. Economy Lumber, therefore, could obtain reimbursement under its policy (1) only for damage to the houses (2) upon a showing that payment to A&P was made for such damage.

A&P signed a release under which Economy Lumber paid to A&P $16,318.30 in full settlement. That amount, as set forth in the release, consists of: (1) $2,098.02 for "[m]aterial lost in remilling because the defects were so severe that it could not be remilled"; (2) $2,175.68 for remilling costs; (3) $1,058.69 for remilled but still defective boards; (4) $5,600.55 for remilled lumber used on the eight houses; (5) $2,779.46 for increased labor on the eight houses; (6) $2,605.90 for increased labor to install remilled siding on "nine (9) buildings."[4] "Said costs include actual costs, plus overhead at fifteen percent (15%), and profit at ten percent (10%)." The agreement further stated that "[a]s a result of the cooperation of the parties hereto, the damages were mitigated and minimized, as otherwise the total damages would have been the entire cost of the lumber since it was wholly unusable [sic]."

The oral evidence presented at trial conflicts with the written terms of the settlement. The agreement makes no mention of diminution in value of the houses as an element of damages. However, John Bacon of Economy Lumber and Loyde Paradise of A&P testified that their settlement took into consideration the decreased value of the houses. Both stated that they had discussed the possibility of having the houses appraised, but in the interest of expediency had agreed to dispense with that appraisal.

Economy Lumber had requested the trial court to find the existence of an understanding between Economy Lumber and A&P that the diminution in value of the houses was equal to the out-of-pocket expenses of A&P incurred in using the defective siding. The trial court did not make this finding. Because the finding was requested and because it pertains to a material issue, namely whether Economy Lumber may recover from INA, under Code of Civil Procedure section 634[5] we may not infer that the trial court would have found for INA.

---

[4]This reference in the release apparently alludes to the eight—not nine—houses that are discussed in this opinion.

[5]Code of Civil Procedure section 634, as then in effect, stated: "When written findings and conclusions are required, and the court has not made findings as to all facts necessary to support the judgment or a finding on a material issue of fact is ambiguous or conflicting, and the record shows that such omission, ambiguity or conflict was brought to the attention of the trial court either prior to entry of judgment or in conjunction with a motion under Section 657 or 663, it shall not be inferred on appeal or upon a motion under Section 657 or 663 that the trial court found in favor of the prevailing party as to such facts or on such issue."

Factfinding is the function of a trial court, not an appellate court. (*Weisz Trucking Co.* v. *Emil R. Wohl Constr.* (1970) 13 Cal.App.3d 256, 263-264 [91 Cal.Rptr. 489].) Since Economy Lumber presented evidence at trial of an understanding with A&P regarding their settlement, we remand so that the trial court may determine: (1) Whether diminution in value to the eight houses was a factor in the settlement agreement; and, if so, (2) the amount representing that diminution in value, which would be recoverable from INA by Economy Lumber.

*Breach of an Implied Covenant\**

. . . . . . . . . . . . . . . . . . . . .

The judgment is reversed and remanded so that the trial court may make further determinations, with or without receiving further evidence or argument, concerning whether diminution in value of the eight houses was a factor in the settlement agreement and, if it was a factor, then the amount representing that diminution in value, which is recoverable from INA by Economy Lumber.

Elkington, Acting P. J., and Newsom, J., concurred.

---

*See footnote, *ante,* page 641.