**AMERICAN HOME ASSURANCE COMPANY, Plaintiff,**

v.

**UNITRAMP LIMITED,**
**et al., Defendants.**

Civil Action No. H–95–522.

United States District Court,
Southern District of Texas.

Nov. 22, 1996.

Innes MacKillop, Houston, TX, for Plaintiff.

Mark Cohen, Houston, TX, for Defendants.

Opinion on Liability

HUGHES, District Judge.

### 1. Introduction.

Unitramp seeks a determination that it was covered by an insurance policy for delivering watered fuel to its chartered ship. The damage occurred the day the fuel was loaded aboard because Unitramp had the ability to detect the injury but chose not to use readily available, quick tests. The identifiable injury was actually sustained at law at the time Unitramp was not insured. Unitramp loses.

### 2. Background.

Unitramp chartered the M.V. *Glenita*, and when the ship was in Corpus Christi Bay it ordered the fuel from Enjet Refining, a fuel broker. On June 8, 1993, Enjet delivered fuel oil from its facility at Ingleside to the *Glenita*. Unitramp kept the Enjet fuel in segregated bunkers. The ship left Ingleside June 9. On June 14, when the *Glenita* was well at sea, the surveyor the ship had hired reported that the fuel's water content was too high. Although it had enough good fuel to complete the voyage to Africa, the ship diverted to Tampa to exchange fuel.

Unitramp sued Enjet. Enjet filed for bankruptcy, and after the stay was lifted, the parties agreed to a judgment for $210,000. Unitramp has demanded payment from American Home Assurance, Enjet's insurance carrier. American asserts an absence of coverage.

If Enjet was covered, it was as an additional insured on a policy American had issued to a third company. The first policy covered Enjet from February 17, 1993, through June 12, 1993, but it excluded the Ingleside facility. The second policy covered June 12, 1993, through June 12, 1994, and it included the Ingleside facility. American contends that the delivery of the fuel on June 9 was the "occurrence" under the terms of the policy, and it is therefore not liable because Enjet's Ingleside facility was not an insured location on that day.

### 3. Appeal.

This court rendered judgment in favor of American, holding that the occurrence was when Enjet delivered the wrong fuel to the *Glenita*—a time when Enjet was not insured.

Unitramp appealed, and the court of appeals remanded for a determination of when Unitramp "sustained actual damage," having not been able to determine whether this court had addressed that question. The court of appeals held that, under Texas law, an occurrence is not when the "act of injury

is committed but rather when the damage from that act is actually sustained." *American Home Assurance Co. v. Unitramp,* 91 F.3d 141 (5th Cir.1996) (citing *Snug Harbor, Ltd. v. Zurich Ins.,* 968 F.2d 538, 544 (5th Cir.1992); *Dorchester Dev. v. Safeco Ins.,* 737 S.W.2d 380, 383 (Tex.App.—Dallas 1987, no writ); *Cullen/Frost Bank of Dallas v. Commonwealth Lloyd's Ins. Co.,* 852 S.W.2d 252, 257 (Tex.App.—Dallas 1993, writ denied)). Liability attaches once the property damage manifests itself—i.e. becomes apparent—during the policy period. *Dorchester,* 737 S.W.2d at 383.

### 4. *Answer.*

The facts establish that actual damage was sustained when the fuel was delivered. These three aspects of this case separate it from those contexts relied on by Unitramp: (a) the identifiability of the damage; (b) the nature of the harm; and (c) the commercial relation.

### 5. *Damage v. Injury.*

■ Determining when actual damage occurs in Texas insurance law is confused by the casual use of ill-defined terms. Texas law says, "there is coverage for property damage resulting from workmanship performed during the policy period when the property damage is not manifested until *after* the policy period." *Dorchester,* 737 S.W.2d at 383 (emphasis in original). This is known as the "manifestation" rule. Property damage "manifests" itself when it is "actually sustained," not when the "merely causative negligence occurs." *Cullen/Frost,* 852 S.W.2d at 257 (citing *Dorchester,* 737 S.W.2d at 383). An injury is "actually sustained" when "an *identifiable* damage or injury, other than merely causative negligence, takes place during the policy period." *Cullen/Frost,* 852 S.W.2d at 257 (citing *Dorchester,* 737 S.W.2d at 383) (emphasis added). A claimant's damage may be identifiable but not identified.

Because of the confusion, Texas turned to Florida and Idaho for persuasive authority. *See Travelers Ins. Co. v. C.J. Gayfer's & Co., Inc.,* 366 So.2d 1199, 1201 (Fla.App.1979) (physical destruction of tangible property re-quired during the policy period; coverage is afforded only for identifiable damage, other than the causative negligence, during the policy); *Millers Mut. Fire Ins. Co. of Texas v. Bailey, Inc.,* 103 Idaho 377, 647 P.2d 1249, 1251 (1982) ("the time of the occurrence of an 'accident,' . . . is not the time the wrongful act was committed but the time the complaining party was actually damaged"). The injuring event was on the day the watered fuel was loaded, and the actual damage was sustained and identifiable that day, well before the Ingleside policy applied.

### 6. *Cause & Effect.*

■ The rule in Texas is an extension of the aphorism "no harm, no foul." If there is harm, the foul occurs when the harm is reasonably detectable rather than when the cause happened to have occurred. The insurance covers "an event . . . which unintentionally . . . causes . . . loss, damages or destruction during the policy period." The effect is the loss, the cause is the delivery, and the combination of the two is the legal injury. Here, both cause and effect occurred before the Ingleside facility was insured.

If in the nature of things the effect cannot be perceived, the law does not recognize that he has been injured until he can reasonably know of his loss. The insurance covers effects that first appear during the policy period regardless of the timing of the cause.

Three basic forms of events occur. First, a cause may produce an effect immediately. This is illustrated by a failure to alter course that results in the ship hitting a reef. Second, a cause may produce an effect later, with the effect's being fully developed when it does occur. This is illustrated by a pipeline valve left open that takes months for enough gas to accumulate near a spark to explode. Third, a cause may produce an effect immediately with the effect's being imperceptible until later. This is illustrated by a misdesigned pipe that leaks water immediately but the consequent rot of the timbers is not apparent for years.

### 7. Identifiability.

The question "When did the property damage manifest itself?" requires the question "When could the damage have reasonably been identified?" The inquiry here is: Before the policy expired, did Unitramp have the capacity reasonably to detect the harm of having been delivered unusable fuel?

Enjet delivered the fuel to the *Glenita* on June 8; Unitramp extracted samples and sent them to Det Norske's laboratory that day; and Det Norske radioed the analysis to the *Glenita* at sea on June 14. The harm remained undetected for six days because Unitramp did not take reasonably available measures to identify it.

Although its chosen method for testing the samples took six days, Unitramp admitted in oral argument and in its briefs, however, that much faster methods of testing fuel for water, a common test in maritime shipping, were readily available. Unitramp conceded that it could have used a local laboratory test the fuel and that it would have taken four to ten hours from the sample's extraction to the test's result. Specifically, Unitramp stipulated that "a full bunker quality test could have been performed by Enjet or Unitramp prior to the vessel's departure, and the test result received within ten hours."

The facts are that there were facilities at Corpus Christi that could have promptly analyzed the samples. American showed that "[i]f the tests ... were performed in Corpus Christi in June of 1993, all of the test results ... could have been made available to a ship or other client in three and a half to four hours ... includ[ing] the test for water content."

### 8. Det Norske & Cost.

Although Unitramp could have easily discovered the contamination in a fraction of the time it took through Det Norske, it chose to use Det Norske for its commercial transaction with Enjet because it was otherwise obliged to use Det Norske under its charter with the ship's owner. Although the charter required extensive testing, all of the testing required by the charter could have been completed before the ship sailed from Corpus Christi on June 9.

From an economic perspective, Unitramp chose not to conduct the simpler, quicker form of fuel test before leaving the port, knowing well that if the six-day analysis showed contamination, the costs of the remedy would be hundreds of times higher by having to interrupt the voyage to debunker and resupply the vessel.

The vessel chose to use the owner-required test for both (a) the acceptance of delivery of fuel from a vendor and (b) the assurance of quality of operation for the owner. Unitramp chose to save money on the local test and to risk the greater costs. Having cut its cost, the ship wants to impose liability for the loss consequent on its "savings" on the fuel seller. The vessel bears the full costs of its frugality.

### 9. Discovery.

Although applicable only to questions of limitations for fraud cases, the discovery rule provides a parallel. In Texas, actions for fraud must be brought within four years after the fraud is committed. If the injured party is not aware of the fraud, the statute begins to run from the time the fraud could have been discovered by the injured party's reasonable diligence. *See Mooney v. Harlin*, 622 S.W.2d 83 (Tex.1981). Reasonable diligence is a question of law. *Ruebeck v. Hunt*, 142 Tex. 167, 176 S.W.2d 738 (1943).

■ A buyer received samples before it signed a purchase contract and falsely represented that it had already tested the material and found it suitable. The buyer's lack of diligence in discovering the unacceptable quantities of leachable lead in the material kept the limitations period from being tolled. The buyer should have exercised reasonable diligence to discover the leachable lead before it signed the contract. *See Poly Products Corp. v. AT & T Nassau Metals, Inc.*, 839 F.Supp. 1238, 1241 (E.D.Tex.1993). Similarly, here, Unitramp could have discovered by reasonable diligence the contamination to the fuel. With minimal effort and cost, Unitramp could have discovered the watered fuel in time to discharge it to Enjet at its moor-

ing, limiting the loss to delay in departure and pumping fuel.

### 10. Objectivity.

Unitramp's failure to identify the damage promptly does not raise even a presumption that the damage was not identifiable. What Unitramp could have done and what it did are clear. Unitramp contends that this lack of control and the time it may take to return a fuel test are part of the "fortuity" against which insurance is bought. The length of time it actually took for Unitramp to conduct the fuel test is not a fortuity but a reasonably predictable commercial transaction. No extraneous, uncontrollable event interrupted the potential for normal commercial delivery and testing.

Unitramp seems to suggest that, because it was contractually bound to use Det Norske, it could not have performed other tests, but the owner's specifying Det Norske did not prohibit tests for other purposes.

### 11. The Idaho Distinction.

Texas courts have considered only situations that involve "the commission of a wrongful act which produces no harm for a period of time and then suddenly manifests itself in a burst of damages." *Bartholomew v. Insurance Co. of North America,* 502 F.Supp. 246, 253 (D.R.I.1980), *cited in Millers,* 647 P.2d at 1253 (the Idaho case); *see also Dorchester,* 737 S.W.2d at 382 (the damage complained of was for faulty workmanship: some concrete flooring was defective because it was prepared improperly and had started to crumble, various gutters were improperly primed and the stain had peeled, and the contractor failed to use concrete perimeter beams under certain patio slabs); *Cullen/Frost,* 852 S.W.2d at 256 (the damage was also faulty workmanship in the construction of condominiums: drainage problems in the garage floor, excessive floor displacement, warped and swollen door and window frames, rotten woodwork on patio doors and window sills, warped and uneven floors, and repeated breakdown of elevators); *Snug Harbor,* 968 F.2d at 540, 544 (the insurance company asserted that there was no occurrence during the policy period because the

damage, misplacement of a petition and citation giving the plaintiff notice of a foreclosure of its property, occurred two weeks before the policy period began to run and did not become apparent until after a default judgment was entered).

In fact, every one of the cases relied on in this Texas trilogy involves cause with delayed effect. *See Travelers,* 366 So.2d at 1200, *cited in Dorchester,* 737 S.W.2d at 383 (the liability insurance covered a plumbing contractor whose workmanship, particularly a joint in the drainage system he installed, failed after the policy expired); *Millers,* 647 P.2d at 1250–51, *cited in Dorchester,* 737 S.W.2d at 383 (the contractor installed polyurethane foam insulation during the policy period, a spark from which caused a fire in the building after the policy period had expired); *Blue Streak Indus. v. N.L. Indus., Inc.,* 650 F.Supp. 733, 734–35 (E.D.La.1986), *cited in Snug Harbor,* 968 F.2d at 544 (a contractor installed gear boxes on a ship whose policy had expired two months before the first box failed); *Taylor–Morley–Simon, Inc. v. Michigan Mut. Ins. Co.,* 645 F.Supp. 596, 600 (E.D.Mo.1986), *aff'd,* 822 F.2d 1093 (8th Cir.1987), *cited in Cullen/Frost,* 852 S.W.2d at 256 (also a construction contract, the damage consisted of cracked walls, ceilings and floors, stress on water and gas lines, and loosening of ducts, all occurring outside of the policy period). Other cases also illustrate this distinction. *See, e.g., Remmer v. Glens Falls Indem. Co.,* 140 Cal.App.2d 84, 295 P.2d 19 (1956) (rock mass, placed several years earlier during grading, came loose and slipped onto victim's property); *Prieto v. Reserve Ins. Co.,* 340 So.2d 1282 (Fla.App.1977) (negligently constructed roof collapses); *Singsaas v. Diederich,* 307 Minn. 153, 238 N.W.2d 878 (1976) (collapse of negligently installed manlift); *Peerless v. Clough,* 105 N.H. 76, 193 A.2d 444, 446 (1963) (fire in negligently built chimney); *Deodato v. Hartford Ins. Co.,* 143 N.J.Super. 396, 363 A.2d 361 (1976) (poorly built roof blows off).

Texas courts have yet to consider the fundamental distinction between cases where actual physical damage is caused and has an effect within the policy period and those where the commission of a wrongful act pro-

duces no discernible harm for a period of time and then "suddenly manifests itself in a burst of damages." *Millers,* 647 P.2d at 1253 (citing *Bartholomew,* 502 F.Supp. at 253).

Between Enjet and Unitramp, the cause produced an instantaneous effect, readily detectable. The legal wrong giving rise to the injury happened at the moment of delivery of the fuel; no further legal wrongdoing occurred. This case falls into the class of cases where *physical damage* is caused and has a simultaneous effect during the policy period. *See, e.g., Hogan v. Midland Nat. Ins. Co.,* 3 Cal.3d 553, 91 Cal.Rptr. 153, 476 P.2d 825 (1970) (irregular lumber cut with defective saw—saw manufacturer's insurer liable for damages occurring before discovery of defect); *United States Fidelity & Guaranty Co. v. American Ins. Co.,* 169 Ind.App. 1, 345 N.E.2d 267 (1976) (damage to structure caused by defective bricks covered by supplier's policy applying to the time the defect was first discovered); *Gruol Constr. Co. v. Insurance Co. of North America,* 11 Wash. App. 632, 524 P.2d 427 (1974) (dry rot occurring over time was property damage and one continuing "occurrence" for liability insurance purposes); *see generally Millers,* 647 P.2d at 1253.

### 12. Commercial Context.

This is not a case about a consumer whose car developed a faulty transmission or a home-owner whose roof collapsed after years of corrosion; this is a case about a sophisticated commercial buyer in a commercial transaction whose goods were defective on delivery.

The standards of commercial law measure the reasonableness of Unitramp's fuel inspection. Generally, "what is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action." TEX.BUS. & COM.CODE ANN. § 1.204(b) (Tex. UCC). Under commercial law a buyer's duty to accept goods is conditioned on the buyer's right reasonably to inspect the goods. Conversely, a buyer is under a duty seasonably to reject goods. The "reasonableness will be determined by trade usages, past practices between the parties and other cir-

cumstances of the case." TEX.BUS. & COM. CODE ANN. § 2.513(a) & cmt. 3 (Tex. UCC).

The reasonableness of an inspection will be affected by the time, place, nature of the goods, and *facilities available for making examination.* See RONALD A. ANDERSON, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 2–513.30 (3d ed.1983); *McClure Oil Corp. v. Murray Equipment, Inc.,* 515 N.E.2d 546 (Ind.App.1987) (difficulty or ease of inspecting the goods is a relevant circumstance in whether the buyer has rejected within a reasonable time).

Reasonableness of time implicates four circumstances: (a) the difficulty of discovery of the defect, (b) the terms of the contract, (c) the perishability of the goods, and (d) the course of performance after the sale and before the formal rejection. JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 8–3 (4th ed.1995).

Although the text of the code does not mention the difficulty of discovery, it has been discussed in a variety of contexts. *See e.g., Miron v. Yonkers Raceway, Inc.,* 400 F.2d 112 (2d Cir.1968) (attempted rejection of a horse twenty-four hours after sale unreasonable where alleged injury could have been discovered by inspection customarily made at time of sale); *Jacob Hartz Seed Co. v. Coleman,* 271 Ark. 756, 612 S.W.2d 91 (1981) (soy beans properly rejected one month after delivery; defect could not be identified prior to testing); *DiDomenico Packaging Corp. v. Nails Again, Inc.,* 139 Misc.2d 525, 527 N.Y.S.2d 676 (1988) (defect in printing on boxes readily discoverable; should have been found in inspection on delivery). The nature of the defect, the complexity of the goods, and the sophistication of the buyer may all influence the difficulty of discovery. WHITE & SUMMERS, *supra,* § 8–3 ("We believe it will be a rare case where a [sophisticated] business buyer is given substantial additional time ... because the defect was 'difficult to discover,' and the courts will be more willing to listen to that argument when it is made by a consumer purchaser of a complex machine.").

In this case, the defect was fully accomplished on delivery. The defect was detectable by a routine industrial laboratory test.

Neither the test nor the transaction was arcane. Commercial facilities at Corpus Christi in June 1993 could have tested the fuel in three and one-half hours. Unitramp was well-accustomed to routine buying of fuel, including the requirements for tests and the costs resulting from sailing with defective fuel.

13. *Conclusion.*

█ This case hinges primarily on the identifiability of the property damage. Because facilities were readily available to test quickly Enjet's delivery of fuel for water contamination, Unitramp unquestionably had the capacity to identify the harm. The cause and its detectable effect occurred before the policy period. Once the fuel was loaded onto the *Glenita*, Unitramp actually sustained harm.

The physical damage to Unitramp occurred at the delivery, without a latent period of deterioration.

Commercial law makes the availability of testing facilities and the difficulty of discovery of the defect the primary factors in determining the reasonableness of Unitramp's conduct.

Unitramp will take nothing from American.