McCLURE OIL CORPORATION and Edward A. McClure d/b/a E.A. McClure Real Estate, Defendants–Appellants,

v.

MURRAY EQUIPMENT, INC., Plaintiff–Appellee.

No. 27A02–8611–CV–00416.

Court of Appeals of Indiana, First District.

Nov. 19, 1987.

Rehearing Denied Jan. 12, 1988.

James T. Beaman, Marion, for defendants-appellants.

Richard J. Thonert, Fort Wayne, for plaintiff-appellee.

RATLIFF, Chief Judge.

## STATEMENT OF THE CASE

McClure Oil Corp. and Edward McClure d/b/a E.A. McClure Real Estate appeal an adverse judgment in favor of Murray Equipment, Inc. We affirm.

## FACTS

The facts most favorable to the judgment reveal that Ed McClure was the president of McClure Oil Corp. His brother, Rick, was the company's secretary-treasurer. McClure Oil was engaged in the business of selling gasoline, fuel oil, and other liquid petroleum products.

In May or June of 1983, Ed McClure contacted Tom Miller, a salesman for Murray Equipment, about a terminal or "tank farm" to be installed on property owned by Ed McClure in Grant County, Indiana.[2] The tank farm was to consist of several large, above-ground storage tanks for gasoline and other petroleum products. Murray Equipment is a supplier of liquid handling equipment. Ed McClure inquired about Murray Equipment's capability to provide the necessary equipment. Tom Miller of Murray Equipment later talked with Ed McClure about the project and then went to the job site in August of 1983. At the time, the large storage tanks already were under construction. Ed McClure told Miller that he wanted the

2. At a terminal, tanker trucks unload liquid petroleum products by using pumps and pipes which are permanent fixtures. The terminal also is capable of loading tanker trucks with the liquid petroleum products from the storage tanks using the same pumps and a loading rack.

tank farm operational as soon as possible; Ed wanted it completed by the end of November of 1983. Ed McClure informed Miller that he needed four pumps capable of loading a tank truck at the rate of 750 gallons per minute. However, the rate of unloading a tank truck was never discussed. Ed McClure also told Miller that he wanted the tank farm completed as economically as possible.

During the discussions about the tank farm's equipment, Miller told Ed McClure that Murray Equipment would furnish the required equipment but not installation. Furthermore, Miller did not agree to provide McClure Oil with drawings suitable for the equipment's installation or for McClure to solicit bids for the installation. The only drawings which Murray Equipment prepared for the project were for Murray Equipment to compile a material list, and also to assist in making the sale. Copies of these drawings were given to Ed McClure.

Ed McClure and McClure Oil undisputedly relied upon Murray Equipment's expertise to select the appropriate pumps and equipment.[3] After talking to a pump manufacturer, Tom Miller determined that a 700 gallon per minute pump was more feasible than one which pumped 750 gallons per minute. Ed McClure approved Miller's recommendation about the proposed pumping capacity. At that time in October, neither Miller nor Ed McClure discussed the specific costs of the pumps; they just agreed that the pumps would be as cheap as possible. Since Ed wanted the project completed by late November, he told Miller to order all of the equipment immediately. Prior to ordering, however, Miller talked with Ed McClure about the "major items" such as the pumps and meters. Murray Equipment ordered most of the equipment in the first part of October, 1983. At that time, Miller ordered four (4) straight centrifugal pumps from the LaBour Pump Company (LaBour).

The ordered equipment arrived in late October through November, 1983. McClure Oil picked up some of the equipment in late October. This pick-up included the four (4) LaBour pumps at a total price of about $14,100. McClure Oil picked up the remainder of the equipment in November of 1983. All of the equipment was stored in McClure Oil's warehouse. On October 31, 1983, Murray Equipment sent an invoice to McClure Oil for the amount of $24,790.48. On December 7, 1983, Murray Equipment sent an invoice to McClure Oil for the amount of $49,944.10. The terms of those invoices, and all subsequent invoices, were net 15 days at 1½% per month thereafter. Additional invoices were sent for small parts and equipment, service charges, and interest charges, bringing the total principal amount to $75,701.49. At no time did McClure Oil object to the invoices' terms.

During the early months of 1984, Murray Equipment and McClure discussed two points in dispute—payment and drawings. In January, 1984, the president of Murray Equipment, Steve Murray, talked to Ed McClure about the unpaid invoices. During the discussion, Ed complained for the first time about the lack of detailed drawings. Ed claimed that he needed drawings suitable for assisting with installation and soliciting bids for installation. Tom Miller also talked with Ed and Rick McClure in January about payment. As with Steve Murray, this was the first time McClure Oil informed Miller of its demands for detailed drawings. Throughout the discussions, Murray Equipment never agreed to furnish installation drawings. Steve Murray contacted McClure Oil again in February and March of 1984, but McClure still did not pay for the equipment.

The progress of these discussions came to a pinnacle in April of 1984. Ed McClure testified that in April, he instructed his brother, Rick, to pay for the tank farm equipment. Rick's testimony and Steve Murray's testimony confirmed Ed's assertion. However, unbeknownst to Steve Murray, Murray Equipment's attorney filed suit against McClure Oil on the same

---

**3.** The only equipment which Ed McClure specifically ordered were four (4) Tokheim meters which registered the amount of product being pumped.

day as Steve's conversation with Ed. A day or two later, Ed changed his mind and told Rick not to pay the invoices.

In the same month of April, McClure Oil hired one Kenny Wilson to install the tank farm equipment. McClure Oil agreed to pay Wilson $39,800 for the job despite Wilson's total lack of experience in installing equipment on a tank farm. In August of 1984, Kenny Wilson informed Ed that he had completed all which he was capable of doing without more detailed drawings. McClure Oil paid him a little more than the agreed price of $39,800 even though Wilson did not complete the job.

In July, 1984, Ed McClure contacted George Priest, a man with 34 years of experience in the petroleum construction business. At Ed's request,[4] Priest agreed to complete the installation. Priest began work at the site in mid August, 1984. The LaBour pumps which Murray Equipment had supplied were operational and pumping product on September 12, 1984. However, the LaBour pumps did not unload a tank truck as quickly as Ed desired. Nine (9) days after the pumps became operational, Ed McClure ordered four (4) pumps manufactured by the Gorman–Rupp Company. The Gorman–Rupp pumps were capable of pumping 650 gallons per minute. The cost of these pumps to McClure Oil was $27,200, almost double the $14,100 cost of the LaBour pumps. McClure Oil used the LaBour pumps for eight (8) to ten (10) weeks. George Priest then replaced the LaBour pumps with the Gorman–Rupp pumps in November of 1984. Priest was able to complete the installation of the tank farm equipment without any drawings whatsoever, because he did not need them. McClure Oil paid Priest on an hourly basis for a total of about $50,000 for completing the job.

Murray Equipment's complaint sought damages in the principal amount of $75,701.49 plus interest at 18% per annum.

McClure Oil's answer contained a counterclaim for breach of implied warranty of fitness for a particular purpose. After a bench trial, the trial court entered extensive findings of fact and conclusions of law and granted judgment in favor of the plaintiff, Murray Equipment, in the amount of $74,860.99 [5] with interest at the rate of 1½% per month starting January 15, 1984. Furthermore, the trial court denied McClure's counterclaim.

As of the date of the trial court's judgment, McClure Oil had never paid for any of the equipment supplied by Murray Equipment which is the subject of this suit. Additionally, McClure Oil has never returned any of the equipment to Murray Equipment. McClure Oil and Ed McClure appeal from the trial court's judgment.

### ISSUES

Restated, the issues are as follows:

1. Whether there was substantial evidence to support the trial court's conclusion that McClure Oil accepted the equipment and did not revoke its acceptance.

2. Whether there was substantial evidence to support the trial court's denial of the defendants' counterclaim for breach of implied warranty of fitness for a particular purpose.

3. Whether there was substantial evidence to support the trial court's award of prejudgment interest at 18 per cent per annum.

4. Whether this appeal was frivolous and meritless, justifying punitive damages.

### DISCUSSION AND DECISION

*Issue One*

The trial court's judgment of $74,860.99 included the amounts payable for four (4) LaBour pumps, eight (8) Vitrolic clamps and gaskets, eighteen (18) Vitrolic nipples, and four (4) Tokheim air eliminators.

---

4. Ed previously had contacted Priest in October or November of 1983, about Priest doing the installation work. However, Priest informed Ed that he was too busy to do the job then.

5. From Murray's requested damages in the amount of $75,701.49, the trial court subtracted $840.50 which was the price of "flex hose" supplied to McClure. The trial court found that the "flex Hose" was not required.

These items totaled about $20,515. McClure Oil argues on appeal that these items of equipment did not benefit McClure Oil in any way. McClure Oil contends that it never accepted the goods so that Murray Equipment was not entitled to recover the price of the goods. In the alternative, McClure argues that if it did accept the goods, it notified Murray within a reasonable time of a breach on Murray's part which revoked McClure's acceptance.

When reviewing the sufficiency of evidence, our standard of review is well known. We will neither reweigh the evidence nor assess the credibility of witnesses; rather, we will examine only that evidence most favorable to the judgment and all reasonable inferences to be drawn therefrom. *E.g., Jackson v. Russell* (1986), Ind.App., 498 N.E.2d 22, 35, *trans. denied.* We will uphold the trial court's decision if it is supported by substantial evidence of probative value. *Abels v. Monroe County Educational Ass'n* (1986), Ind.App., 489 N.E.2d 533, 540, *cert. denied* (1987), —— U.S. ——, 107 S.Ct. 1347, 94 L.Ed.2d 518.

■ The resolution of this case turns upon the application of the Indiana Uniform Commercial Code's chapter on sales. Indiana Code sections 26–1–2–101 through 26–1–2–725 (hereafter designated IC 2–101 through 2–725). Under IC 2–601, McClure Oil, as buyer, had the right upon delivery of the equipment either to reject all of it, accept all of it, or accept any commercial units and reject the rest if "the goods or the tender of delivery fail[ed] *in any respect* to conform to the contract". (Emphasis added). IC 2–602 prescribes the manner of rejection. "Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." IC 2–602(1); *see also Hahn v. Ford Motor Co.* (1982), Ind.App., 434 N.E. 2d 943, 957, *trans. denied.* The purpose of giving seasonable notice is to permit the seller to take protective action such as

withdrawing the goods, proposing a cure, or beginning negotiations to settle the dispute. 3 W. Hawkland, *Uniform Commercial Code Series* § 2–602:02 (1984 and 1987 Supp.). As for what constitutes a reasonable time for notification of rejection, Ind. Code § 26–1–1–204(2) defines it as dependent upon the nature, purpose and circumstances of the situation. The circumstances include the ease or difficulty of inspecting the goods. Hawkland, at § 2–602:01.

■ McClure Oil alleges that Murray Equipment was timely notified of rejection on September 19, 1984, just seven (7) days after the LaBour pumps became operational on September 12, 1984. McClure bases its claim upon Plaintiff's Exhibit No. 19, which is a letter from Murray Equipment to McClure Oil. The letter, dated October 11, 1984, states that on September 19, 1984, a representative from the LaBour Pump Company informed Murray Equipment that Murray's customer, McClure Oil, was having problems with the LaBour pumps while attempting to unload a tank truck. The letter continues as follows:

> "As we were told by [the LaBour representative], he instructed you that there was an airlock on the suction side of the pump and that it was necessary for you to install a small valve in the product line or on the pump casing. The purpose of this valve is to allow the operator to expel the trapped air from the pump to start up. There being no communication from McClure Oil Corporation to Murray Equipment regarding this problem, in addition to the fact that we agreed with [LaBour's] appraisal, we took no further action."

Record at 751. We do not consider this letter as a proper rejection.[6] To qualify as a rejection under IC 2–602, the buyer's rejection must be clear and unambiguous. *Ho v. Wolfe* (1985), Tex.App., 688 S.W.2d 693, 696. "To be effective, the notice must make it clear that the rejection is final,

---

6. Although Murray alleges that this cannot constitute "notice" of rejection since it was LaBour, not McClure, who notified Murray of the pump problems, we do not need to consider this issue due to our resolution on other grounds. However, we note that there is authority for the proposition that if the seller receives actual notice of rejection, he cannot claim that the buyer's notice was defective. *See* Hawkland, at § 2–602:02.

allowing the seller to act and dispose of the goods without further dealings with the buyer. There is a difference between a statement designed to open negotiations and a flat rejection." Hawkland, at § 2–602:02; *see also* 3A Duesenberg & King, *Bender's Uniform Commercial Code Service* § 14.02[1][d]. The letter from LaBour to Murray certainly does not denote McClure's clear and unambiguous rejection of the goods. At most, the letter indicates that McClure was simply having problems with the pumps and that the problems could be corrected. Thus, the trial court had sufficient evidence before it to conclude that the letter from Murray Equipment to McClure Oil did not signify McClure's flat rejection of the equipment.

■ McClure next alleges that its counterclaim filed October 1, 1984, constituted a timely rejection. The counterclaim stated that the LaBour pumps were not suitable for the purpose for which they were to be used and that McClure incurred additional expense in replacing the pumps. Although the counterclaim made it clear that McClure did not want the LaBour pumps and not just that McClure was unhappy about the pumps' performance, the issue arises as to whether this attempted rejection was given within a reasonable time. As stated earlier, Ed McClure testified that the LaBour pumps started pumping product on September 12, 1984. The counterclaim was filed with the trial court on October 1, 1984. Therefore, nineteen (19) days had elapsed since McClure began using the pumps. In addition to this delay, the trial court heard evidence that Ed McClure and others at McClure Oil were dissatisfied with the LaBour pumps from the very first day of their operation. In fact, Ed McClure ordered the Gorman–Rupp replacement pumps on September 21, 1984, just nine (9) days after the LaBour pumps were first operational. The trial court also heard undisputed evidence that when Murray Equipment ordered the tank farm equipment for McClure Oil, Ed McClure had intended the tank farm to be completed by the end of November of 1983. However, McClure Oil did practically nothing with the equipment for over nine (9) months due to no fault on the part of Murray Equipment. Viewing all of this evidence together, we conclude that there was sufficient evidence for the trial court to conclude that the October 1, 1984, counterclaim purporting to reject a portion of the equipment was not made within a reasonable time. Therefore, McClure Oil did not effectively reject the goods.

Since McClure Oil did not reject the goods, it is axiomatic that it accepted them. IC 2–606(1)(a) provides, "Acceptance of goods occurs when the buyer: ... fails to make an effective rejection ..., but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them." Since we previously concluded that there was sufficient evidence to support the conclusion that McClure Oil did not effectively reject the goods, McClure is deemed to have accepted the goods.

■ Our conclusion that McClure Oil accepted the equipment is bolstered by other statutory provisions. IC 2–606(1)(c) provides that the buyer accepts the goods if it "does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him". Similarly, IC 2–602(2)(a) states that "after rejection any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller". In the present case, McClure Oil continued to use the LaBour pumps for 8–10 weeks before their replacement. Also, McClure Oil has never returned any of the disputed equipment. We deem these actions as constituting McClure's acceptance of the goods, even if we had concluded that McClure had otherwise effectively rejected the goods.

■ McClure's acceptance has important implications. Once the buyer accepts the goods, the buyer is precluded from rejecting them. IC 2–607(2). Furthermore, the buyer must pay the contract price for any goods accepted. IC 2–607(1). If the buyer does not pay the contract price as it becomes due, the seller may sue for the price of goods accepted. IC 2–709(1).

■ Having decided that sufficient evidence supports the conclusion that McClure Oil accepted the tank farm equipment, we must now decide whether McClure Oil revoked its acceptance pursuant to IC 2–608. Since we previously concluded that McClure Oil accepted the tank farm equipment, McClure had the burden of proving that the goods were non-conforming to justify revocation. IC 2–607(4). The rationale for placing the burden of proof upon the buyer is that once the buyer has accepted the goods, it is difficult, if not impossible, for the seller to prove conformity at the time of tender or delivery. Hawkland, at §§ 2–601:06, 2–607:08. Thus, since the trial court ruled adversely on McClure's claim that it revoked its acceptance, we must apply the negative judgment standard on review. A party appealing from a negative judgment must show that the trial court's judgment is contrary to law. *Steward v. City of Mount Vernon* (1986), Ind. App., 497 N.E.2d 939, 942. Thus, we may reverse only when the evidence is without conflict and leads unerringly to a conclusion different from that reached by the trial court. *Dotlich v. Dotlich* (1985), Ind. App., 475 N.E.2d 331, 342, *trans. denied.*

■ Under the statutory provisions of IC 2–608(1), the purchaser "may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him...." Once the buyer revokes his acceptance of the goods, he has all of the rights and duties with regard to the goods as if he had rejected them. IC 2–608(3). In the present case, we cannot say that the evidence was without conflict and that the evidence led to but one conclusion opposite to that reached by the trial court. McClure Oil failed to prove that the LaBour pumps, the clamps and gaskets, the nipples, and the air eliminators were so non-conforming as to substantially impair their value.[7] McClure Oil merely presented evidence that the LaBour pumps did not perform as quickly as it desired; McClure did not claim that the pumps did not work. McClure presented evidence that the replacement pumps manufactured by Gorman–Rupp were more efficient for their type of application. However, the trial court also heard evidence that Ed McClure wanted to complete the project as cheaply as possible and that the LaBour pumps were about half the cost of the Gorman–Rupp pumps. Also, Ed McClure wanted the tank farm to be completed as quickly as possible. As for the remaining equipment which McClure disputes, the trial court heard conflicting evidence upon whether the equipment was necessary or appropriate. In appealing a negative judgment, however, McClure Oil cannot question the sufficiency of the evidence. *Dotlich*, at 342. As a result, we are unable to conclude that McClure satisfied its burden of proving either that the disputed equipment's performance or the necessity for such equipment resulted in a substantial impairment of value to McClure to warrant revocation of acceptance.[8] Thus, the trial court's decision was not contrary to law.

*Issue Two*

■ McClure Oil alleges that the trial court erred in denying its counterclaim for breach of warranty. Although McClure's acceptance precluded its rejection, acceptance did not impair McClure's remedies for breach of warranties. IC 2–607(2). As stated earlier, since McClure accepted the goods, it had the burden of proving any breach. IC 2–607(4). Therefore, McClure is appealing from a negative judgment.

■ McClure's counterclaim sought relief from Murray's alleged breach of an implied warranty of fitness for a particular purpose. *See* IC 2–315. The assertion of breach of warranties is governed by IC 2–607(3)(a), which provides as follows:

---

7. McClure Oil argues that the trial court's decision concerning the flex hose was inconsistent with its decision concerning the remaining equipment. However, the trial court could have concluded from the evidence that the flex hose was so non-conforming that its value was substantially impaired. Therefore, we see no inconsistency.

8. We also note that the trial court could have concluded that McClure's attempted revocation of acceptance was not made within a reasonable time as required by IC 2–608(2).

"(3) Where a tender has been accepted
   (a) the buyer must within a reasonable
time after he discovers or should have
discovered any breach notify the seller of
breach or be barred from any remedy."
Timely notice of a breach of warranty is a
substantive condition precedent to recovery. *Courtesy Enterprises, Inc. v. Richards Laboratories* (1983), Ind.App., 457
N.E.2d 572, 579; *Thompson Farms, Inc. v.
Corno Feed Products* (1977), 173 Ind.App.
682, 706, 366 N.E.2d 3, 17, *trans. denied.*
The buyer's failure to provide timely notice
waives its right to assert any breach. IC
2-607(3)(a); *Courtesy Enterprises*, at 579.

We find that McClure did give notice of its warranty claim within a reasonable time. As discussed in Issue One,
Plaintiff's Exhibit 19 was a letter from
Murray Equipment to McClure Oil stating
that on September 19, 1984, LaBour Pump
contacted Murray regarding McClure's
problems with the pumps. This was only
seven (7) days after the LaBour pumps
became operational. Although we previously held that this did not constitute a
rejection since it was not clear and unambiguous, it is sufficient as notice for a
breach of warranty. Under IC 2-607(3)(a),
the notice is sufficient if it simply informs
the seller that there are some problems
with the goods. Hawkland, at § 2-607:07.
The letter clearly indicated that Murray
Equipment was aware that McClure was
having problems with the pumps. Therefore, Murray was given timely notice of
McClure's breach of warranty claims.

Although McClure gave notice
within a reasonable time, we cannot conclude that the trial court's decision denying
the breach of warranty counterclaim was
contrary to law. The trial court specifically found that the equipment was appropriate for a tank farm. In arriving at this
decision, the trial court heard conflicting
evidence concerning the equipment's fitness for the particular purpose of a tank
farm. When reviewing a negative judgment, we cannot weigh the sufficiency of
the evidence. From the evidence at trial,
the court could have concluded that
McClure just wanted a quicker pumping

operation and that McClure had changed
its mind about getting economical equipment. Therefore, under our standard of
review for a negative judgment, the trial
court did not err as a matter of law.

McClure Oil further alleges that the trial
court failed to make specific findings on its
counterclaim. However, the court specifically found that the equipment, except for
the flex hose, was appropriate for the tank
farm. This finding, viewed with the other
findings in their totality, was sufficient to
deny McClure's claim that the equipment
was not fit for the particular purpose. *See
K.B. v. S.B.* (1981), Ind.App., 415 N.E.2d
749, 754.

*Issue Three*

McClure alleges that the trial court
erred in awarding prejudgment interest at
the rate of 18% per annum. McClure
claims that prejudgment interest should
have been at the statutory rate of 8% pursuant to Indiana Code sections 24-4.6-1-
102 and 103. Recently, Judge Garrard
summarized the law on prejudgment interest as follows:

"Under Indiana law, interest may be
allowed as damages when money is withheld after payment is due on an account.
*Rogers v. West* (1857), 9 Ind. 400; IC
24-4.6-1-103(b). The crucial factor in
determining whether damages in the
form of pre-judgment interest are allowable is whether the damages were ascertainable in accordance with fixed rules of
evidence and accepted standards of valuation.... If the claim is based upon a
contract, and the terms of that contract
make the claim ascertainable, and the
amount of that claim rests upon 'mere
computation,' pre-judgment interest is allowable...."

*Courtesy Enterprises*, at 579-80 (citations
omitted). McClure argues that there was
no contractual agreement concerning interest and that, therefore, the 8% statutory
rate was applicable.

Although the record does not disclose a
specific agreement concerning the terms
for the sale of the tank farm equipment,
there was other evidence in the record to
support the trial court's award of interest

at 1½% per month. For example, Murray Equipment submitted into evidence a copy of a letter dated May 9, 1980, sent to McClure Oil which contained Murray's terms and conditions. The letter specifically stated that payment was due "net 15 days from invoice date" and that "[p]ast due accounts shall be charged a service charge of 1½% per month which is an annual percentage rate of 18%." Record at 475. Although there is no direct proof that McClure received this letter, the trial court certainly could have inferred such. Also, the invoices for the disputed equipment all stated that there was a 1½% service charge per month on all past due amounts. Record at 157–70. At trial, McClure Oil acknowledged receipt of the invoices. However, McClure Oil at no time objected to the invoices' terms. From this evidence, we hold that there was sufficient evidence to warrant the trial court's award of interest at 1½% per month as of January 15, 1984.

*Issue Four*

■ In its Appellee's Brief, Murray Equipment seeks damages for McClure Oil bringing a frivolous and vexatious appeal. Murray states, "Under the Rules of Appellate Procedure, Rule 15(H), an Appellee can be awarded costs of the action, excluding printing of Briefs. The Appellee requests the court to award all applicable costs of this action, excluding Brief printing costs, to Appellee."

Apparently, Murray does not understand Appellate Rule 15(H). That rule provides as follows:

"(H) Costs.

"(1) Who Recovers. When the judgment is affirmed in whole, the appellee *shall* recover costs; and when the judgment is reversed in whole the appellant shall recover costs in the court on appeal and the court below. In all other cases costs shall be awarded as the court may deem right following, as nearly as possible, the general regulation for awarding costs.

"(2) What Included. The fee paid for procuring the transcript, the costs of serving and notice of appeal are a part of the costs of the court on appeal. Each party to the action shall bear the cost of printing his own briefs."

(Emphasis added). Since we are affirming the trial court's judgment in whole, Murray seeks that which is already granted by Appellate Rule 15(H). Therefore, we need not rule on Murray's request for costs.

■ Murray may have intended to proceed under Appellate Rule 15(G). That provision states as follows:

"(G) Damages Against Appellant. If the court on appeal affirms the judgment, damages may be assessed in favor of the appellee not exceeding ten per cent (10%) upon the judgment, in money judgments, and in other cases in the discretion of the court; and the court shall remand such cause for execution."

In fact, the case upon which Murray relied, *Deetz v. McGowan* (1980), Ind.App., 403 N.E.2d 1160, discusses the application of Appellate Rule 15(G), not 15(H). Indiana courts have used Appellate Rule 15(G) to recover damages for frivolous, vexatious appeals. However, even if Murray Equipment had proceeded under 15(G) instead of 15(H), we would still be constrained to deny such drastic relief. Our supreme court recently addressed Rule 15(G) in *Orr v. Turco Manufacturing Co.* (1987), Ind., 512 N.E.2d 151. Justice Dickson, writing for the court, stated:

"In general, a discretionary award of damages has been recognized as proper when an appeal is permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay. [Citations omitted]. However, in exercising its discretionary power to award damages on appeal, an appellate tribunal must use extreme restraint."

*Orr*, at 152. The court then held that "punitive damages may not be imposed to punish lack of merit unless an appellant's contentions and arguments are *utterly devoid of all plausibility.*" *Id.* at 153 (emphasis added). We hold that McClure's arguments on appeal were not "utterly devoid of all plausibility." McClure Oil presented cogent authority in its arguments, particularly in its diligent attempt

to apply the UCC provisions to these facts. McClure's arguments were plausible although not convincing. Therefore, even if Murray had sought relief under Appellate Rule 15(G), we would hold that McClure's appeal was not meritless or frivolous.

Judgment affirmed in its entirety.

ROBERTSON and BUCHANAN, JJ., concur.