In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 20-1949

BEVERLY ZYLSTRA and BERNARD ZYLSTRA,

*Plaintiffs-Appellants*,

*v.*

DRV, LLC,

*Defendant-Appellee*.

_____

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:18-cv-00266-WCL-SLC — **William C. Lee**, *Judge*.

_____

ARGUED DECEMBER 11, 2020 — DECIDED AUGUST 10, 2021

_____

Before ROVNER, HAMILTON, and SCUDDER, *Circuit Judges*.

ROVNER, *Circuit Judge*. Bernard and Beverly Zylstra spent close to $100,000 on a brand-new recreational vehicle in order to enjoy travel and recreation during their retirement years. One can imagine their disappointment when they began to collect a long list of defects, large and small, as they began their adventures. As the list grew, so did their frustration until, on August 27, 2018, they filed suit against the manufacturer, DRV, LLC, for breach of express and implied

warranties under state law, violation of the federal Magnuson-Moss Act (MMWA), and violation of state deceptive practices acts. Although we sympathize with the frustrations the Zylstra's experienced trying to rectify the long list of problems, we uphold the district court's grant of summary judgment for DRV, as even in the light most favorable to the Zylstras, DRV never had a reasonable opportunity to repair the defects as required under the warranty and therefore the Zylstras' claims cannot survive.

## I.

The Zylstras purchased their RV from non-party Bradley Bourbonnais Chevy Hundai RV in Bourbonnais, Illinois for $91,559.15. The RV came with a one-year warranty that warranted that the portions of the RV manufactured by DRV that were not otherwise excluded would be "free from defects in material and workmanship supplied and attributable to DRV during normal use." R. 28-8. Under the terms of the warranty, "[w]ritten notice of defects subject to warranty coverage must be given to the selling dealer or DRV … within 30 days after the defect is discovered … no later than 30 days after [the warranty] expiration." *Id.* In addition, "the owner shall contact the selling dealer or the Factory if a problem occurs which may be directly covered by this warranty with sufficient information to resolve the matter," and the owner is required to take the RV to the selling dealer or factory for repair. *Id.*

Unlike an automobile, each DRV vehicle is custom built for the purchaser. Consequently, as with a custom-built home, there are almost always adjustments and repairs to be made after the sale. Thus, after the Zylstras purchased the RV, but before delivery, the dealer performed some of these tweaks while waiting for the Zylstras to pick up the vehicle.

The Zylstras neither requested nor knew about these pre-pick-up repairs and adjustments. The Zylstras assert that a Bradley salesman later informed them that the vehicle had been "cannibalized" while on the Bradley lot, but they do not assert any claims about specific items that were missing or replaced with inferior items. R. 28-3 at 13.

Once the Zylstras retrieved the RV, they went for a two-day camping trip to put the vehicle to the test. During that trip, they made a punch list of about seventeen items, most of which were relatively minor, ranging from items like a missing screw in an overhead compartment to a leaky toilet valve. Less than a week after dropping off the RV at the dealer for those repairs, the Bradley service manager called the Zylstras to inform them that the technicians had discovered damage to the roof. A dispute ensued over who was responsible for the roof damage, and ultimately the Zylstras decided to make an insurance claim and have the roof repaired at the DRV factory, as it had quoted a price for the repair that was almost half of the quote from Bradley. The dealer did not perform any warranty repairs while awaiting the outcome of the roof dispute.

When the Zylstras took the RV to the factory repair shop in Indiana for the roof repair, they learned that they could take the RV to any DRV authorized dealer for warranty repairs. On June 27, 2017, they did just that—bringing the RV to Plaza RV, another authorized dealer. This was the first time after they picked up the vehicle that any technicians put their hands on it to make warranty repairs, which by this point numbered about eighteen. The Zylstras picked up the RV fifty-one days later, on June 27, 2017, and took it on an eleven-day camping trip to make sure all the repairs had been

successful. During that trip, the Zylstras made a new punch list of fifteen items. Only two of the items on the new list also had been on the previous list—a missing overhead cabinet screw that may have been mis-identified the first time, and an antenna, manufactured by a separate company, that was displaying error codes. The remaining sixteen items included two new items that will become important to this case. The Zylstras identified them as "Black Holding Tank Leaks" and "Black Holding Tank Hard to Close." R. 28-3 at 9.

On September 11, 2017, the Zylstras dropped the RV off at Plaza RV once again to repair the new punch list items, and to add some after-market items that were outside of the warranty claim and not directly relevant to the case. The Zylstras informed Plaza RV that they would need the vehicle by January 1 for a long trip to Texas, and, in fact, they were able to retrieve the vehicle on December 21, 2017. From there it went into storage for a week until they left for their trip.

A week into the Texas trip the Zylstras started to smell a strong odor after dumping the black sewage tank—the tank on an RV that holds waste from the toilet. A few weeks later, Mr. Zylstra discovered that the black tank valve was leaking at the flange connections and that sewage had been leaking from the tank into the insulation throughout the underbelly of the RV. He could not find a DRV authorized dealer to repair the leak, but an independent mobile technician came and completed the repair. The technician removed the valve gaskets, cleaned the valve seals, cleaned the valve, and replaced the valve gaskets between the two flanges.

Soon after that event, the Zylstras contacted Greg Weldon from DRV to discuss the black tank repairs and who would shoulder the bill. We describe this dispute further within, but

in the end, the Zylstras did not take the RV to the dealer or any authorized DRV repair shop to remedy the leaking black tank or the damage it caused. To this day, the black tank and related issues have not been presented to DRV or the dealer to repair.

After the leak, the Zylstras stopped using the RV out of concern for their health. They contend that it is not, and never has been, fit for its ordinary purpose of recreational use. Consequently, on August 27, 2018, they filed a complaint alleging breach of express and implied warranty, violation of the Magnuson-Moss Warranty Act (MMWA), and violation of state consumer protection laws. The district court granted DRV's motion for summary judgment on all claims on May 18, 2020. On appeal the Zylstras allege that (1) the district court improperly made factual determinations as to disputed issues of material fact when granting summary judgment to DRV; (2) reasonable minds could conclude that DRV breached its express warranty under state law and violated the MMWA; (3) the district court committed reversible error when it failed to conduct a choice of law analysis regarding the Zylstras' breach of implied warranty claim under state law; and (4) reasonable minds could conclude that DRV violated Indiana's Deceptive Consumer Sales Act.

## II.

The parties presented dozens of pages of specific and detailed facts. The presentation of so many seemingly disputed facts generally prompts us to pause and ask whether such a case is one to resolve on summary judgment. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). In this case, however, the disputed facts are not material to the outcome. We review the district court's grant of summary judgment de novo and

will affirm only if we find that there are no genuine issue of material fact and DRV is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Although we take the facts in the light most favorable to the plaintiff, those facts must be supported by sufficient record evidence. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

## A. Breach of warranty.

### 1. Opportunity to remedy defects.

We begin with the Zylstras' primary claim that DRV breached the express warranty under state law. Both parties contend that Indiana law governs this claim. Under Indiana law, to prevail on a breach of warranty claim, the Zylstras must prove "(1) the existence of a warranty, (2) a breach, (3) causation, and (4) damages." *Mathews v. REV Recreation Grp., Inc.*, 931 F.3d 619, 622 (7th Cir. 2019), *citing Peltz Const. Co. v. Dunham*, 436 N.E.2d 892, 894 (Ind. Ct. App. 1982). A warranty can be breached, under Indiana law, where "an exclusive or limited remedy fail[s] of its essential purpose." Ind. Code § 26-1-2-719(2); *Perry v. Gulf Stream Coach, Inc.*, 814 N.E.2d 634, 643 (Ind. Ct. App. 2004). "Timely notice of a breach of warranty is a substantive condition precedent to recovery." *McClure Oil Corp. v. Murray Equip., Inc.*, 515 N.E.2d 546, 554 (Ind. Ct. App. 1987).

In order to make a claim of breach of warranty, the purchaser must give the warrantor a reasonable opportunity to repair the defects. *Mathews*, 931 F.3d at 622. The Zylstras contend that this is only true if the warranty specifically imposes that requirement. In this case, the warranty requires the purchasers to notify DRV or a selling dealer of any warrantable

issue and to take the RV to DRV or an authorized dealer for repairs. R. 28-8 at 2. It also requires an owner to notify DRV if the selling dealer is unwilling to resolve a problem covered by the warranty. *Id.* Those requirements are, in fact, requirements to allow a reasonable opportunity to repair. But even were they not, this court has recently interpreted Indiana state law to require that the purchaser give the warrantor the opportunity to repair, and to do so more than two times: "[u]nder Indiana law, two chances is not a reasonable opportunity to cure the defects such that the warranty failed of its essential purpose." *Mathews*, 931 F.3d at 622, (*citing General Motors Corp. v. Sheets*, 818 N.E.2d 49, 53 (Ind. Ct. App. 2004)) (explaining that under Indiana's Lemon Law, "[a] reasonable number of attempts is considered to have been undertaken if the nonconformity has been subject to repair at least four times but continues to exist, or if the vehicle has been out of service for at least thirty business days and the nonconformity continues to exist."). The federal district courts in this circuit have relied on this interpretation of Indiana law to hold that a warranty does not fail of its essential purpose unless an RV manufacturer has been given a reasonable number of attempts to cure the defect, meaning at least more than two. *See, e.g., Smith v. Nexus RVs, LLC.*, 468 F. Supp. 3d 1012, 1024 (N.D. Ind. 2020) (finding that the warranty did not fail at its essential purpose where the manufacturer corrected all of the defects in the first attempt, except for one that required two attempts to fix.); *Castagna v. Newmar Corp.*, No. 3:15-CV-249 JD, 2020 WL 525936, at *5 (N.D. Ind. Feb. 3, 2020) (noting that the Seventh Circuit's opinion in *Mathews* has stated that two chances is not a reasonable opportunity to cure defects.).

It is worth noting that in *Mathews*, the owners of the RV encountered a long list of troubling defects. None of those

defects, however, interfered as fully and completely with the use and enjoyment of the RV as the primary defect that the Zylstras encountered—a sewage leak that permeated the insulation of the underbelly of the RV and, according to the Zylstras facts, made the RV completely unusable for its intended purpose. Although in *Mathews* we stated that "two chances is not a reasonable opportunity to cure the defects such that the warranty failed of its essential purpose," we reserve judgment as to whether, in the case of a major defect that made the RV unusable in any manner, we would require the purchaser to present the vehicle three times. *Mathews*, 931 F.3d 619, 622. We need not resolve this question here, as after the RV became contaminated by the sewage leak, the Zylstras did not present it to DRV even once.

The Zylstras complain that the *Mathews* decision is distinguishable, because (1) the warranty in that case contained additional requirements; (2) the warranty contained a back-up remedy containing additional repairs, and (3) there were multiple unauthorized repair attempts. We do not see why any of these differences, if they are, in fact differences, alters the requirement described in *Mathews* as applied to this case.

What the Zylstras seem to want, from their long list of itemized problems with the RV, is a ruling that takes into account not just the number of attempts and the number of days out of service, but instead also looks at the sheer quantity of repair issues, even if they are timely repaired. It is an understandable position, but one without current legal support. Moreover, Indiana law requires owners to give the manufacturer an opportunity to cure. The Zylstras undoubtedly bought an RV beleaguered by problems. The Zylstras paid almost $100,000 for an RV that was the culmination of a dream

for how to spend their retirement. Once again, we can only imagine their disappointment at having invested in a retirement dream riddled with defects. Nevertheless, the law attempts to strike a reasonable balance between providing relief to purchasers and allowing manufacturers the opportunity to fix remediable problems.

Consequently, we have interpreted Indiana law to require a warranty holder to give a defendant a reasonable chance to cure the defects. *Mathews*, 931 F.3d at 623. And under our interpretation, a reasonable opportunity to cure, at least in cases where the defects are somewhat minor, and not affecting full use of the vehicle, means at least three chances. *Id.* at 622. We can conclude, therefore, that in this case the problems must remain unresolved after the third attempt before a purchaser can support a claim for breach of warranty. It is true that the *Mathews* court pointed to Indiana's Lemon Law (which is not directly applicable to RVs) as support for its interpretation, but courts commonly analogize from and refer to related statutes in statutory interpretation. (We note that under Indiana's Lemon Law, to which the *Mathews* court pointed for the presentation requirement, the defect must be presented at least four times). The problem for the Zylstras' claim is that none of the issues of which they complain meet these requirements. Either the issue was never presented to DRV for repair, it was fixed under DRV's warranty in three or fewer attempts, or it was presented less than three times and DRV did not have a sufficient opportunity to repair.

We begin with the easiest to address—the Zylstras' list of twelve items that they did not discover until after the date of the last repair. *See* Zylstra brief at pp 33–34. Although we sympathize with the Zylstras for what must seem like an ever-

increasing list of problems, issues that the Zylstras never presented to DRV or the dealer for repair cannot form the basis of a breach of warranty claim. The limited warranty requires the Zylstras to notify DRV or a selling dealer of any warrantable issue within the repair period. It is undebatable that none of these late discovered twelve items was ever presented to DRV.

The Zylstras also list eleven minor defects that were subject to repair twice. *See* items labeled "(2x)" in Zylstra brief at 32–33. It is unclear which of the alleged six "repair attempts" enumerated in their brief the Zylstras count toward the two repair attempts before technicians laid hands on these items on June 27, 2017.[1] But, in fact, each of these eleven items was remedied the first time a DRV factory repair person attempted repair—when the Zylstras took the RV to Plaza RV on June 27, 2017. But even were we to give the Zylstras the benefit of the doubt that DRV had the opportunity to repair these eleven issues before June 27, 2017, the warranty cannot have failed of its essential purpose when DRV paid for and successfully repaired these eleven issues even in two tries, as alleged. These successfully repaired issues, that DRV paid for and repaired under warranty in less than three tries, cannot form the basis of a breach of warranty claim. Nor, of course,

---

[1] It is difficult to follow the Zylstras' counts of repair attempts. If we were to count their alleged second and third repair attempts (which they describe on pages 20-24 of their brief), then all of these items would have been subject to three repair attempts, and, according to their list, all repaired in three or fewer attempts. As we describe further below, however, several of the events that the Zylstras describe cannot, as a matter of law, be considered repair attempts. Moreover, any issue resolved in three attempts would not constitute a breach of warranty.

can the many other items listed in their brief that were re-
paired on the first try. (By our count, those total nineteen.)

After eliminating all of these possible sources of a war-
ranty breach, we are left with six items that fall under the cat-
egory of items that the Zylstras claim were presented but are
still not repaired. Those are: the over-the-air antenna is
"showing codes;" crooked microwave; crooked television; the
door hold will not stay open; the gas switch on the stove is
hard to light; and "black tank leak into the underbelly." *See*
Zylstra brief at 33. The over-the-air antenna can be eliminated,
as it was manufactured by a third party and subject to third
party warranties. DRV's warranty specifically excludes,
"[e]quipment, products, components, appliances or accesso-
ries not originally manufactured by DRV." R. 20 at 1. As the
warranty goes on to explain, "Some of these products may be
covered under a warranty by their manufacturers." *Id.* The
antenna was not manufactured by DRV, was subject to a
third-party warranty, and thus cannot form the basis of a war-
ranty breach.

The Zylstras concede that they only presented the prob-
lem with the door hold and the gas switch to DRV on a single
occasion, and the crooked microwave and television twice.
*See* Zylstra brief at 33. For the reasons we have already artic-
ulated, these single and double presentations cannot form the
basis of a claim of breach of warranty.

We have now eliminated all but the most troubling defect
in this case—that involving the black tank leak. There is no
dispute that the leaking black tank and the resulting mold
have caused significant damage to the RV, but what we do
not know is whether the problems amounted to a breach of
warranty. Nor do we know whether the damage was caused

by a manufacturer or user error. (The process for emptying, cleaning, and maintaining the black tank and its connections is complicated and it must be done properly.) For purposes of summary judgment, however, we will assume a manufacturer error.

The first time the Zylstras ever reported any issues with the black tank was on September 11, 2017, when they took the RV to Plaza RV to repair approximately sixteen items. These were issues they identified after giving the RV a test run on an eleven-day camping trip. The list of items included, among many others: "Black Holding Tank Hard to Close; Black Holding Tank Leak." R. 28-3 at 9. Plaza RV informed the Zylstras that it had repaired all of the items and that the service (other than a few non-warranty, after-market items) was covered by the warranty.

After picking up the RV from that service appointment, the Zylstras left for their first extended trip in the RV—a trip to Texas—at the beginning of January 2018. It was on that trip that they once again noticed the black tank leak and also a subsequent odor. When the Zylstras could not find an authorized DRV repair person who could come to their location, they eventually hired a mobile technician. Although the technician cleaned and replaced some valves and parts, the Zylstras were still concerned about the residue from the leak.

According to Mr. Zylstra's deposition testimony, shortly after the repair, the Zylstras contacted someone from DRV about the black tank leak. During that conversation, Mr. Zylstra asked for a guarantee that it could be cleaned, but the representative of DRV did not provide one. The deposition testimony was as follows:

Q.      At any point in time, did Greg indicate·that DRV wasn't willing to attempt to address the·smell and the issues?

A.      Not that I recall. Just that they couldn't guarantee anything that—as far as cleanup. Couldn't guarantee that, you know, the unit wouldn't be a biohazard problem.

Q.      Did Greg use those words, that he "couldn't guarantee"—

A.      Yes, those were his words, that "DRV couldn't guarantee."

Q.      That it wouldn't be a biohazard problem?

A.      Yeah, that wouldn't—that they couldn't get it cleaned up.·He didn't say biohazard, but couldn't get it cleaned up.

Q.      And you took that as a cue and never—or did you ever schedule any kind of repairs with DRV or any dealer to try to address the smell issue or the leak from the tank?

A.      No.·Because I was—I was looking around to try to find some information on—you know, when·we—if you have a spill like that in your RV, what can be done about it?·I don't remember any subsequent conversations with Greg.

R. 23-1 at 75–76. Thus, according to this testimony, the DRV representative never stated that DRV was not willing to attempt to address the clean up and odor. R. 23-1 at 75.

Nevertheless, the Zylstras did not schedule any kind of repair with DRV or any dealer after that. R. 23-1 at 75–76. Mr. Zylstra also testified that they did not request reimbursement for the repairs and maintenance done by the mobile repair person. R. 23-1 at 71.

In a later affidavit filed after the deposition, Mr. Zylstra stated that the representative from DRV agreed to reimburse the Zylstras under the warranty for the repair done by the mobile repair person. R. 28-3 at 10. He also stated, contrary to his deposition testimony, that the representative from DRV "told me that any cleanup would not be covered under the DRV warranty." *Id.* The affidavit testimony was as follows:

> Soon after, we contacted Greg Weldon from DRV about the black tank leak and he agreed that DRV would reimburse us under the warranty for the repair of the leak that had been performed by Gabriel's Maintenance. We also discussed the possibility of the RV going back to the DRV factory to clean up the sewage that had leaked into the RV, but during our call with Greg Weldon on February 5, 2018, he told us that DRV would not guarantee that they would be able to clean up the sewage or that the sewage smell would ever go away. He also told me that any clean up would not be covered under the DRV warranty. It was at this point that we lost all faith in DRV and their ability or willingness to stand behind their warranty and repair our RV.

R. 28-3 at 10–11. This later affidavit claim that DRV refused to cover the clean up under the warranty, which appears to

contradict the earlier deposition testimony, cannot be the basis for a factual dispute. *Howell v. Smith*, 853 F.3d 892, 900, n.18 (7th Cir. 2017) (noting that the court does not allow a party to contradict deposition testimony with later-filed contradictory affidavits in order to create "sham issues of fact with affidavits that contradict their prior depositions.").

The Zylstras retort that the affidavit does not contradict the deposition because in the deposition, Mr. Zylstra stated that he did "not recall" whether Greg stated that DRV was not willing to address the smell and the sewage issues. In the affidavit, he seemed certain that the DRV representative "told me that any clean up would not be covered under the DRV warranty." R. 28-3 at 10. It takes a rather thin knife to split those hairs.

In any event this factual dispute, should we find one, would not prevent summary judgment. It is undisputed that the repair of the black tank valve was never presented to DRV or the dealer after the Texas camping trip. Instead, because they "lost all faith in DRV and their ability or willingness to stand behind their warranty and repair [the] RV," the Zylstras did not schedule any repairs with DRV or any dealer to try to address the issues from the leak. R. 28-3 at 10–11. Consequently, because the Zylstras never presented the RV to DRV for repair after the Texas trip and the sewage leak, they did not comply with the terms of the warranty and thus defeated the warranty's purpose.[2]

---

[2] On top of this failure-to-present-for-repair question, DRV argues that the black tank leak in Texas was caused by the Zylatras' misuse as opposed to a defect attributable to DRV. (A black tank must be cleaned and maintained properly.) But whether the leak could be attributable to a

The Zylstras assert that the district court made factual determinations as to "which repairs to consider and which repairs not." Zylstra brief at 18. But as we noted, even when we have taken each repair attempt in the light most favorable to the Zylstras, they still have not provided DRV with a sufficient opportunity to repair. In this way, this case mirrors that of the recent decision in *Kuberski v. Rev Recreation Grp., Inc.*, No. 20-3127, 2021 WL 3076749, at *4 (7th Cir. July 21, 2021). In that case, we found that the warranty created bilateral obligations. "The dealer and manufacturer agreed to repair defects, but the buyer was required to provide the dealer and manufacturer with notice and an opportunity to cure the defects." *Id.* at *2. We held that the plaintiff's failure to give the RV manufacturer an opportunity to cure the defects defeated the warranty's stated purpose. Although the case referenced North Carolina law on substantial compliance with a contract, the conclusion is the same here where the warranty creates the same bilateral obligations on the parties. As the *Kuberski* opinion explained:

> In the present case, we can infer from the warranty that in exchange for a promise to repair any defects, REV expected that the buyer (Kuberski) would notify it of defects and give it an opportunity to cure. Such a "notice-and-opportunity" regime gives the manufacturer a chance to make amends with its customer, see what went wrong with its product, learn from its

warrantable defect or was the result of user error, is a factual question that we cannot address on summary judgment. For the sake of summary judgment, we will assume that DRV was responsible for the defect. *See Payne*, 337 F.3d at 770.

errors, and evaluate how its authorized dealers
are performing repairs.

*Id.* at *3. The Zylstras' failure to present the RV to DRV for repair dooms the Zylstras' claim, just as it did in *Kuberski*.

### 2. Time out of service.

The Zylstras also argue that DRV did not repair the defects within a reasonable amount of time, leaving the RV out of service for 230 days, thus defeating the essential purpose of the warranty. This too requires a seemingly fact-intensive analysis. Taking all of the facts in the light most favorable to the Zylstras, however, we conclude, as a matter of law, that the essential purpose of the warranty was not defeated by the amount of time out of service.

Calculating the time out of service for an RV is complicated. Unlike an automobile, many RVs spend the majority of their time in storage. When a person takes a car to the repair shop, she expects a quick turnaround as she likely relies on that vehicle for employment and daily living. When owners drop off an RV for repair, however, they may not need the vehicle for many months, and, in some cases in fact, every day that the RV sits in the repair shop, is one less day that the owner must pay for storage. This makes calculating out-of-service days less straight forward than it would for an ordinary automobile. But even giving the Zylstras the benefit of the doubt on all factual matters, we can determine as a matter of law, that the time that the RV spent in repair was not so excessive that the warranty failed of its essential purpose.

For example, included in the Zylstras' calculation of 230 days out of service are the 52 days between the time they purchased the RV and the time they were able to pick it up, after

purchasing a truck to tow it. During this time, DRV per-
formed normal adjustments and tweaks, but the Zylstras did
not request these repairs or even know about them. Therefore,
they did not notify the dealer as required by the warranty. As
a matter of law these were not warranty claims and the RV
was not out of service during the time they were addressed.

In addition, the time the RV spent at Bradley did not con-
stitute a reasonable opportunity to cure the defect as required
by the warranty. On April 29, 2017, the Zylstras brought the
RV to Bradley Chevrolet for punch list repairs. (The Zylstras
label this the "Second Post-Sale Repair Attempt.") After the
RV had been there for about a week, the dispute about re-
sponsibility for the damaged roof ensued. According to Mr.
Zylstra, once the Zylstras informed Bradley that they would
take the RV to DRV's factory service center in Indiana for the
roof repair, the service manager told them "they can just take
care of the rest of the problems" on the punch list. R. 23-1 at
48. The Zylstras picked up the RV from Bradley on May 20,
2017. According to the warranty, "If the selling dealer is un-
willing to resolve a problem which the owner is convinced is
covered by this warranty, the owner should write to DRV at
the address listed below with a description of the problem
and attempts made to resolve it." The Zylstras did not inform
DRV that the dealer was unwilling to resolve the problems.[3]

_____

[3] The Zylstras did eventually complain to DRV about the service it
received from Bradley—many months and repairs later—but that letter
merely stated, "When informed that the factory would be replacing the
roof the service manager, Donald Caine, said that the factory could just fix
the other items as well." R. 28-17 at 2. Mr. Zylstra's deposition testimony
was in accord: "I had informed [the service manager] that the factory
would be replacing the roof. He got a little annoyed and said, "Well, they
can just take care of the rest of the problems." R. 23-1 at 47-48. The Zylstras

Instead, after the Zylstras were informed of the roof damage
and the cost to repair they "reached out to the factory to have
the repairs done at the factory." R. 23-1 at 48. Thus, under the
facts as presented by the Zylstras, this was not an adequate
presentation of the issue to DRV.

The Zylstras dropped the RV off at the DRV service facility
in Indiana for the scheduled roof repair on June 21, 2017. (The
Zylstras label this the "Third Post-Sale Repair Attempt.") The
Zylstras asked if the factory could address the warranty is-
sues as well, but the factory informed them that they had only
scheduled two days for the roof repair and did not have suf-
ficient labor available to address the other issues for some
time. R. 34-2. While there, the Zylstras learned that they could
have the warranty items addressed at any authorized dealer
and decided to take the RV to Plaza RV for repairs rather than
wait for the factory to have time available. These four days,
therefore, do not count toward warranty repairs, as the Zyl-
stras made an appointment for the non-warranty-related roof
repair only and did not follow up when told that the warranty
repairs, which were outside the scope of the roof-repair ap-
pointment, would take more time. As a legal matter, a pur-
chaser has not given a warrantor a reasonable opportunity to
repair if he appears at the doorstep of the manufacturer and
demands repair in a timeframe that is not possible for the war-
rantor. This is akin to a patient scheduling a dental cleaning
at the dentist and while there asking if the dentist can also
repair a crown, fill a cavity, and perform teeth whitening. The
dentist, who has only scheduled an hour with a hygienist for

---

never followed up with DRV as was the requirement of the warranty. In-
stead, they took the RV to another authorized service center where the
warranty items were repaired.

cleaning, has not denied treatment when she requires the patient to schedule another time for the remaining treatments.

Instead of following up with the DRV service facility in Indiana after the roof repair, the Zylstras decided to take the RV to another authorized dealer, Plaza RV. (The Zylstras label this the "Fourth Post-Sale Repair Attempt.") Even with the facts taken in the light most favorable to the Zylstras, the visit to Plaza RV does not support a claim for breach of contract. When the Zylstras dropped the RV off at Plaza RV on June 27, 2017, they were told that the repair shop was shorthanded and that it would "be a little bit" before the RV would be finished. R. 23-1 at 53. The parties did not agree on a completion date. Plaza RV held the Zylstra's RV for fifty-one days, during which time it attempted repairs of seventeen items that the Zylstras had submitted. Plaza RV also performed one non-warranty installation for the Zylstras. This was the first time any dealer or factory attempted any warranty repairs of the RV. By the Zylstras' own account, they were informed that Plaza RV was shorthanded, and that the repairs would be delayed. But also by their own account, they acquiesced to the repair under these conditions, and they did not notify DRV that the dealer was unwilling to repair any problems.

After the August 2017 pick-up, the Zylstras went camping again to make certain everything was working before their scheduled trip to Texas in January 2018. During that trip, they compiled a second punch list of sixteen items, which they presented to Plaza RV when they dropped the RV off on September 11, 2017. (The Zylstras label this the "Fifth Post-Sale Repair Attempt.") Only one warranty item from the first list appeared on the second list—some screws that were missing from an overhead compartment. Not only was this a very

minor issue, but also, Mr. Zylstra was not certain whether Plaza RV had understood which door was missing the screws the first time. (The antenna repairs also appeared on both lists, but we have already determined that the antenna was not covered under the DRV warranty). This was also the first time that the Zylstras mentioned any problems with the black holding tank, which they stated "leaks" and was "hard to close." R. 28-3 at 9. During this time at Plaza RV, the Zylstras also decided to add some after-market items (a fireplace and some automatic stairs, for example) which were separate and apart from any of the warranty repairs and added some repair time to the clock.

When the Zylstras dropped off their RV at Plaza RV on September 11, 2017, they told Plaza RV that they needed the RV to be repaired before the start of 2018—in time for their trip to Texas. Although 102 days is a long time for the RV to be out of service, the Zylstras made clear that they did not need the RV until the start of the new year. And, in fact, when Plaza RV completed the repairs by December 21, 2017 (ten days before the end of the year), the Zylstras put the vehicle in storage until they were ready to use it. The Zylstras claim that their letter to DRV during this repair time demonstrated that they did not accede to this several month repair time. This letter, however, only references having lost "a significant amount of camping enjoyment by not having a usable coach in our possession," and does not specifically reference whether this particular time in the shop at Plaza RV (September 11, 2017 to the date of the letter, October 16, 2017) had interfered with their camping time or whether they had intended to have the RV in storage in any event. R. 28-17 at 2. In sum, the repairs were completed within the time frame set forth by the Zylstras themselves and therefore could not have

been evidence of a breach or that the warranty failed of its essential purpose.

In the end, the Zylstras' stated breach of express warranty claim fails because DRV did not have the required opportunity to repair the warranty items. We have also considered the days out of service during the times in which DRV had the opportunity to repair, and conclude that, as a matter of law, the repair time could not have caused the warranty to fail of its essential purpose. For this reason the claims under the Magnuson Moss Warranty Act also fail. The Act creates a federal cause of action for any "consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under [the statute], or under a written warranty, implied warranty, or service contract." 15 U.S.C. § 2310(d)(1). The MMWA depends on the existence of an underlying viable state-law warranty claim, and so the two claims can be evaluated together and succeed or fail together.

## B. Breach of implied warranty.

For these same reasons, the Zylstras' implied warranty claim must fail too. As we have interpreted Indiana law in the past, just as with a claim for breach of an express warranty, a buyer must give the warrantor a reasonable opportunity to cure any alleged defect in order to make a claim of breach of an implied warranty. *Matthews*, 931 F.3d at 623. Any other interpretation would make a warrantor strictly liable for any warrantable defects without being given any opportunity to cure the defect.

The Zylstras do not make a substantive argument about the implied warranty claim in their opening brief and instead raise these issues only in the reply brief. As such, the

substantive argument is waived. *Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012) ("[A]rguments raised for the first time in a reply brief are deemed waived."). In the opening brief, the only issue the Zylstras raise related to the implied warranty (issue three on pages 38–40 of their brief), is a claim that the district court committed reversible error when it failed to conduct a choice of law analysis regarding the implied warranty claim. The Zylstras requested that the district court apply Indiana law, which, as we described in *Mathews*, requires a reasonable opportunity to cure the defect. DRV, on the other hand, asked the court to apply Illinois law, which requires privity of contract to bring a claim of implied warranty of merchantability. *See Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 525 (7th Cir. 2003) ("Under the law of Illinois, privity of contract is a prerequisite to recover economic damages for breach of implied warranty."). Under either state law, the Zylstras' implied breach of warranty claim fails. The Zylstras did not give DRV an opportunity to cure. And under Illinois law, the Zylstras' claim would have been defeated right out of the gate, as they lacked privity of contract with DRV, having bought the RV from a dealer.

## C. Indiana Deceptive Consumer Sales Act.

The Zylstras' final claim is that DRV violated the Indiana Deceptive Consumer Sales Act. Those claims can be categorized as (1) uncured deceptive acts (which do not require a showing of an intent to defraud or mislead); and (2) incurable deceptive acts (which require such a showing). Ind. Code § 24-5-0.5-2(7) & (8). The Zylstras allege that the uncured deceptive acts are (a) breaching an express warranty; (b) breaching an implied warranty; and (c) violating the MMWA. Because we have concluded that none of these breaches or

violations occurred, these claims fail. And in any event, the Indiana Supreme Court has stated that a breach of contract does not suffice to support a claim of false representation under the Act. *McKinney v. State*, 693 N.E.2d 65, 73 (Ind. 1998) ("Although these allegations may support a breach of contract claim, without more flesh these bare bones do not state claims under the Act. A broken promise is not ipso facto a false representation.").

The Zylstras also allege that DRV committed incurable deceptive acts by (a) representing that the RV had performance characteristics, accessories, uses, or benefits which DRV reasonably knew it did not; (b) misrepresenting that the RV was of a particular standard or quality; (c) knowingly misrepresenting the Zylstras' warranty rights; and (d) stalling and delaying a performance obligation under the warranty by refusing to perform repairs.

As evidence that DRV misrepresented the performance and quality of the RV, the Zylstras point to a brochure that advertises that the RV "offers all the comforts of home, all the conveniences of a residential kitchen and the peace of mind knowing that you've chosen the *best construction* on the market today." R. 28-4 at 3 (emphasis in original). But such statements of "unverifiable opinion," are classic examples of puffery and are not actionable under the IDCSA. *Kesling v. Hubler Nissan, Inc.*, 997 N.E.2d 327, 332–33 (Ind. 2013) ("statements of the seller's opinion, not made as a representation of fact—such as claiming a product is "the best"—are simply puffing which does not create an express warranty.") (cleaned up); *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 868 (7th Cir. 1999) (noting that empty superlatives and meaningless sales patter are not misrepresentations.). As we noted, RVs

are more like new homes than automobiles in many ways. As with a new home, adjustments and changes are often required and the buyer has some time to note and ask for repair or replacement of defective parts. As a result, a long list of post-production repairs does not necessarily prove that the RV is of deficient quality. Consequently, we can conclude that DRV did not commit a deceptive act under Ind. Code. 24-5-0.5-3(a) through its advertisements or by representing that the RV was of a standard or quality that it was not.

Taking the facts in the light most favorable to the Zylstras, an employee at Bradley Chevrolet misrepresented to them that they were required to take the RV to Bradley Chevrolet for any and all warranty repairs. Incurable deceptive acts require a showing of intent, and the Zylstras did not offer any evidence that the employee intended to mislead them as opposed to merely being confused or misinformed. Finally, as to stalling and delaying warranty repairs, these claims were discussed and rejected in our discussion of the reasonableness of the time for repair.

For the reasons stated above, the judgment of the district court is AFFIRMED in all respects.